[No. S035410. June 12, 1995.]

CUSTOMER COMPANY, Plaintiff and Appellant, v.
CITY OF SACRAMENTO et al., Defendants and Respondents.

370

**Counsel**

Aiken, Kramer, & Cummings, Fred V. Cummings, Matthew F. Graham, Suzanne Wyatt and George E. Paras for Plaintiff and Appellant.

Ronald A. Zumbrun, James S. Burling and Alexander Dushku as Amici Curiae on behalf of Plaintiff and Appellant.

Sharon Siedorf Cardenas, City Attorney, William L. Owen, Acting City Attorney, Richard F. Antoine, Deputy City Attorney, Edson & LaPlante,

John M. LaPlante, Bradley E. Neunzig, Porter, Scott, Weiberg & Delehant and Stephen E. Horan for Defendants and Respondents.

Bertrand, Fox & Elliot and Gregory M. Fox as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**GEORGE, J.**—A felony suspect, reputed to be armed and dangerous, took refuge in a store and refused to surrender. In the course of apprehending the suspect, the police fired tear gas into the store, causing extensive property damage. The issue we address is whether the owner of the store may bring an action for inverse condemnation against the public entities that employed the law enforcement officers, on the theory that the damage caused by the officers constituted a taking or damaging of private property for public use within the meaning of the "just compensation" clause of the California Constitution. (Cal. Const., art. I, § 19.)

For the reasons that follow, we hold that an action for inverse condemnation does not lie in the present case to recover damages caused by the efforts of law enforcement officers to enforce the criminal laws. As we shall explain, under the circumstances presented here the public entities involved may be held liable, if at all, only in a tort action filed pursuant to the Tort Claims Act. (Gov. Code, § 810 et seq.)

I

In October 1987, Customer Company (Customer) sued the City of Sacramento (City) and Sacramento County (County), alleging numerous causes of action, including inverse condemnation and negligence. Customer alleged that on June 22, 1987, police officers and deputy sheriffs "caused a criminal suspect to hide" in Rogers Food and Liquor store, which is owned and operated by Customer, and caused extensive damage to the store and its contents in their efforts to capture the suspect.

In a series of rulings, the superior court granted judgment on the pleadings in favor of City and County. As to the negligence cause of action, the superior court ruled that City and County were immune from liability pursuant to Government Code section 820.2, which provides immunity to public entities for their employees' acts and omissions resulting from "the exercise of . . . discretion" by the employee. As to the inverse condemnation cause of action, the court ruled that, as a matter of law, "the action[] of

the police . . . was a proper exercise of the police power to protect the public health, safety and welfare." Customer appealed, and the Court of Appeal affirmed the judgment. Customer sought, and was granted, review in this court solely on the inverse condemnation issue.

Following oral argument, we requested supplemental briefs addressing the issue whether Customer would be entitled to relief under the Tort Claims Act (Gov. Code, § 810 et seq.). In its supplemental brief, Customer expressly "waived the right to relief under the Tort Claims Act."

## II

As acknowledged by Customer in its opening brief, the facts of the present case are undisputed. Christopher Nash was wanted for a series of armed robberies. On June 19, 1987, police officers spotted Nash, who was reputed to be armed and "extremely dangerous," driving a stolen automobile with "switched" license plates. Confidential informants had related that Nash "always" carried a .380-caliber semiautomatic pistol and had said "he wouldn't be taken alive, and he would shoot it out with police officers." Nash apparently became aware of the officers' presence, accelerated and began making numerous lane changes, eventually eluding the officers.

At approximately 8 a.m. on June 22, 1987, Deputy Sheriff Larry Chapman, dressed in plain clothes and driving an unmarked vehicle, was conducting a surveillance of Nash's home when Nash and his girlfriend, Violet Nelson, emerged from the residence, entered the stolen automobile, and drove off. Deputy Chapman followed and requested assistance, intending to stop the vehicle once other officers arrived to assist him. He did not inform the dispatcher that this was a covert operation. Before such assistance arrived, Nash drove into the parking lot of Rogers Food and Liquor store, parked the vehicle, and entered the store with Nelson. Deputy Chapman radioed a message that Nash had entered the store. The deputy then parked on the street and waited for assistance to arrive, intending to arrest Nash when he left the store.

Shortly after 8:30 a.m., four City police officers in plain clothes and driving unmarked vehicles joined the surveillance of Nash's vehicle in the parking lot of Customer's store. But when a marked police vehicle and a marked sheriff's vehicle with its emergency lights flashing drove into the parking lot in response to the call for assistance, the officers concluded Nash must have become aware of their presence and, fearing he might escape through a rear exit, surrounded the building. Nash did attempt to flee through a rear exit but, upon seeing law enforcement officers, reentered the store.

Using the public address system in one of the police vehicles, the officers ordered everyone to vacate the store. The store clerk, Felipe Valverde, and Nash's girlfriend, Nelson, left the store, but Nash did not. Valverde stated that no one except Nash was inside the store and provided information about the premises, including the number and locations of the exits to the building and the telephone number inside the store. Nelson was arrested and confirmed that Nash was inside the store. She stated there were two firearms in his vehicle but asserted he was unarmed. A .380-caliber automatic handgun and a shotgun with the stock sawed off later were seized from the stolen vehicle Nash had been driving. The police remained concerned that Nash might be armed, despite Nelson's statement to the contrary. As one officer stated: "You can't believe the [veracity] or the truthfulness of any person under those conditions, especially if it's the girlfriend talking to her boy friend. Of course she's going to say he's unarmed."

Additional law enforcement personnel were called to the scene. The police stopped traffic and evacuated the area around the store so that, if there were gunfire, no bystanders would be injured. Ambulances and fire department units were summoned and asked to stand by.

Several more requests for Nash to surrender were made, using the police vehicle's public address system. Nash made no response and was not visible inside the store. The police department's special weapons and tactics (SWAT) team was summoned.

Police officers continued their efforts to convince Nash to surrender. A trained negotiator attempted to telephone Nash and used a loud hailer, or megaphone, to direct Nash to answer the telephone. But Nash did not do so, and the telephone inside the store later ceased operating. The negotiator then attempted for an hour or two to communicate with Nash using a loud hailer, but Nash did not respond.

The store clerk stated there was a listening device inside the store, which revealed sounds of movement inside the premises. Gas masks were distributed to the officers surrounding the building, and the store's utilities were shut off.

Shortly after 11 a.m., Lieutenant George Mijares determined that further efforts at negotiation were futile and instructed the SWAT team to employ tear gas. Lieutenant Mijares explained: "I saw no need to wait any longer at that point. We had about thirty or forty police personnel tied up in this operation. Major traffic jam in the area. We had the people out of the store, and I saw absolutely no benefit in waiting any longer because every effort

we had made had no beneficial result. There was no response whatsoever from the store . . . . It was plain to me that he was not going to communicate with us . . . ." Lieutenant Mijares estimated that "maybe 70 percent of the day shift" was present at the scene. He explained as follows his reasons for ordering the use of tear gas: "What we wanted to do was deploy tear gas, which would force Nash to come out. He would come out, be confused, his senses would be impaired. The information [we had was that] he's armed and dangerous, so if he was going to be involved in a fire fight, he would be most inaccurate and generally the suspect[s] come out even without their weapons after being [a]ffected by tear gas. So it was the safest way to do it for everybody concerned." Assistant Chief of Police for the City of Sacramento, Jerry Finney, further noted: "Even if tear gas should not induce voluntary surrender of an armed suspect, then it reduces the suspect's ability to offer armed resistance to SWAT officers as they enter the building or premises."

Lieutenant Matthew Powers, who at the time of the present incident was a sergeant and one of the City's two SWAT team leaders, described as follows the reasons for the decision to employ tear gas: "a) Nash was believed to be armed and also using 'crank', which is a street name for amphetamines. Suspects using crank often exhibit paranoid, erratic behavior. [¶] b) Waiting Nash out did not appear a viable alternative, because he was barricaded in a convenience store containing extensive provisions. In short, he would not be soon starved out. And, attempts to negotiate had proved futile. [¶] c) I would not want my officers entering the store without first introducing tear gas, because the suspect had an excellent field of fire at any approaching officer due to the physical characteristics of the store. He could easily see out without disclosing his location, and we could not see clearly the interior of the store. If he were behind the coolers, then the coolers would offer him excellent concealment and, at the same time, afford him an excellent field of fire over the interior of the store and the outside approach to the store. [¶] d) There was no cover to utilize while rushing or approaching the store front. [¶] e) We ruled out entries through the roof because the store had a drop ceiling. Any officer making entry through the roof would probably disclose his location, inviting fire, and yet, until fired upon, have no idea of suspect Nash's location."

The SWAT team fired three rounds of tear gas into the store and ordered Nash to surrender, but he failed to emerge from the building. After a few minutes, more tear gas was fired into the store and Nash again was ordered to leave the building. When Nash did not appear, additional tear gas was fired into the store and, approximately 30 minutes after the first tear gas canister was fired, members of the SWAT team entered and searched for Nash, without success.

Having determined that Nash was not on the ground level of the store, the SWAT team fired several rounds of tear gas into the attic. Shortly after noon, a SWAT team member saw a vent move on the roof of the store. A short time later, mace was sprayed into some attic vents.

At 1:15 p.m., nearly five hours after Nash first was ordered to leave the building, members of the SWAT team reentered the store and located Nash hiding in the attic, "burrowed under insulation." Apparently the gas had "rendered him unable to offer resistance," and he was arrested and placed into a patrol vehicle, where he collapsed. He was transferred to an ambulance and taken to a medical center for treatment.

Damage to the store included numerous broken windows, wall mirrors, and acoustical ceiling panels. The store's entire inventory of food and other merchandise had been contaminated with tear gas. An environmental consulting firm hired by Customer determined the tear gas that had been used constituted an "extremely hazardous" toxic substance as defined by title 22 of the former California Administrative Code (now the California Code of Regulations), requiring "very specific disposal techniques" for all contaminated items. With the exception of liquids in sealed containers, which were discharged into the sewer system upon governmental approval being obtained and applicable fees being paid, the contaminated items were shipped to, and deposited in, the class I hazardous waste dump located in Casmalia, California. The total property damage exceeded $275,000, which (among other components) included nearly $90,000 in contaminated inventory, approximately $150,000 to dispose of this hazardous waste, and over $18,000 to repair the building and fixtures.

An expert witness opined that an excessive amount of tear gas had been employed. This expert estimated that four to six canisters "would probably [have been] adequate," rather than the twelve or thirteen canisters used. There was no evidence, however, that the damage to the store and its merchandise would have been less had only four to six canisters of tear gas been used. To the contrary, several witnesses stated that, in order to be effective, sufficient tear gas must be employed to permeate the entire area that is accessible to the suspect. The evidence indicates that the store's merchandise was contaminated, requiring its disposal as toxic waste, as soon as the first round of tear gas canisters suffused the store with gas.

### III

The context of the present case is familiar: Customer is seeking to recover from City and County for property damage caused to its store by the

actions of public employees in the performance of their public duties. What is unusual is the means chosen by Customer to obtain such relief. Customer has abandoned its cause of action for negligence under the Tort Claims Act (Gov. Code, § 810 et seq.), now contending solely that it has a constitutional right to obtain recovery from the public entities under an inverse condemnation theory.[1] As we shall explain, we conclude that the facts of this case do not support an inverse condemnation claim under the applicable provision of the California Constitution.[2]

Article I, section 19, of the California Constitution (section 19) provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."

■   As is made clear by the text of this constitutional provision, read as a whole, the "just compensation" clause is concerned, most directly, with the state's exercise of its traditional eminent domain power, guaranteeing that when the state proposes to take private property for public use, the owner of

---

[1]Although uncommon, such attempts to bring an action for inverse condemnation rather than for negligence are hardly unprecedented. In a 1948 annotation discussing such efforts, it was observed: "When private property is damaged by negligence of governmental agents . . . , the primary obstacle with which a litigant and counsel may be confronted, in attempting to secure redress, is the traditional immunity of certain governmental bodies from liability for tort. If recovery is to be had, this barrier must somehow be skirted, and the 'eminent domain' theory is one way of attempting to go around it." (Annot., Taking for Public Purpose (1948) 2 A.L.R.2d 677, 678, fn. omitted.)

In a supplemental brief, Customer suggested it may have had additional reasons for abandoning its negligence cause of action: "Appellant's attorneys fees and costs to date in this matter total $360,000.00. It . . . is not willing to incur the additional expense of a trial of the issue[] whether the police acted negligently, a trial in which even if Appellant prevails *it will be required to pay its attorney's fees*." As discussed below, if Customer were to prevail on its inverse condemnation cause of action, it would be entitled to recover its costs, including attorney fees (Code Civ. Proc., § 1036), and the judgment would include prejudgment interest of at least $185,784 (*Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 797 [214 Cal.Rptr. 904, 700 P.2d 794]).

[2]Customer does not base its claim upon the takings clause of the Fifth Amendment to the federal Constitution, which is applicable to the states through the Fourteenth Amendment (*Dolan* v. *City of Tigard* (1994) 512 U.S. __, __ [129 L.Ed.2d 304, 315, 114 S.Ct. 2309, 2316] and provides: "[N]or shall private property be taken for public use, without just compensation."

the property promptly will receive just compensation.[3] And, as the words suggest, an "inverse condemnation" action may be pursued when the state or other public entity improperly has taken private property for public use without following the requisite condemnation procedures—as when the state, in constructing a public project, occupies land that it has not taken by eminent domain, or when the state takes other action that effectively circumvents the constitutional requirement that just compensation be paid before private property is taken for public use.[4]

█ Although the requirement of "just compensation" has been extended, in limited circumstances—beyond its traditional context involving the taking or damaging of private property in connection with public improvement projects—to encompass government regulations that constitute the functional equivalent of an exercise of eminent domain,[5] section 19, contrary to Customer's suggestion, never has been applied to require a

---

[3]"Eminent domain is the right of the people or government to take private property for public use." (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 918, p. 467; see Code Civ. Proc., § 1240.010.)

[4]"An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner. The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action. [Citations.]" (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 347 [144 P.2d 818]; Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility* (1966) Wis. L.Rev. 3, 4, fn. 2.)

[5]For example, in *Dolan* v. *City of Tigard, supra,* 509 U.S. __, __ [129 L.Ed.2d 304, 316, 114 S.Ct. 2309], the high court held that the just compensation clause limits the authority of a city to require that a property owner, in order to obtain a building permit, dedicate a portion of his or her property to the city for flood control and traffic improvements: "Without question, had the city simply required petitioner to dedicate a strip of land along Fanno Creek for public use, rather than conditioning the grant of her permit to redevelop her property on such a dedication, a taking would have occurred. [Citation.]" In *Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. 1003, __ [120 L.Ed.2d 798, 813-814, 112 S.Ct. 2886], the high court considered the rationale for the rule that a regulation that "denies all economically beneficial or productive use of land" will be considered a taking: "Perhaps it is simply, as Justice Brennan suggested, that total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. [Citation.]" The opinion later notes "the practical equivalence in this setting of negative regulation and appropriation." (*Id.* at p. __ [120 L.Ed.2d at p. 815.) In *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825, 831 [97 L.Ed.2d 677, 685-686, 107 S.Ct. 3141], the high court held that property owners could not be required to allow a public easement over a portion of their beachfront property in order to obtain a permit to demolish an existing structure and replace it with a new residence: "Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking." Terming such conditions " 'extortion' " (*id.* at p. 837 [97 L.Ed.2d at p. 689]), the opinion ends by stating that if California "wants an easement across the Nollans' property, it must pay for it." (*Id.* at p. 842 [97 L.Ed.2d at p. 692].)

public entity to compensate a property owner for property damage resulting from the efforts of law enforcement officers to enforce the criminal laws.

Customer's argument that it may bring an action for inverse condemnation is based upon a literal (and overly simplistic) interpretation of section 19—an assertion that its property was "damaged for public use" within the meaning of that constitutional provision. But section 19 never has been applied in a literal manner, without regard to the history or intent of the provision. As Justice Oliver Wendell Holmes observed regarding the analogous provision of the Fifth Amendment to the federal Constitution: "[T]he constitutional requirement of compensation when property is taken cannot be pressed to its grammatical extreme . . . ." (*Tyson & Brother* v. *Banton* (1927) 273 U.S. 418, 445-446 [71 L.Ed. 718, 729, 47 S.Ct. 426, 58 A.L.R. 1236] (dis. opn. of Holmes, J.).)

As is demonstrated by both the history and the consistent judicial interpretation of section 19, that provision never was intended, and never has been interpreted, to impose a constitutional obligation upon the government to pay "just compensation" whenever a governmental employee commits an act that causes loss of private property. Instead, as we shall see, the addition of the "or damaged" language in the California "just compensation" provision simply was designed to expand the circumstances in which a private property owner may recover when the state takes property for a public use, or when the state's construction of a public work causes damage to adjacent or nearby property owners. Neither the "taken" nor the "or damaged" language ever has been extended to apply outside the realm of eminent domain or public works to impose a Constitution-based liability, *unamenable to legislative regulation*, for property damage incidentally caused by the actions of public employees in the pursuit of their public duties. On the contrary, such property damage, like any personal injury caused by the same type of public employee activity, has—throughout the entire history of section 19—been recoverable, if at all, under general tort principles, principles that always have been understood to be subject to the control and regulation of the Legislature.

The original version of our state's just compensation provision, contained in the California Constitution of 1849, applied only to private property that had been "taken for public use." (Cal. Const. of 1849, art. I, § 8.) The federal Constitution contains identical language. As one commentator has observed regarding the federal constitutional provision: "The most historically settled application of the Just Compensation Clause—indeed perhaps the *only* historically settled application—is the requirement that government must pay for property it seizes through an exercise of eminent domain. . . . Most of

the original American state constitutions contained no compensation clause, and uncompensated seizures of property for public roads and other uses were not unusual in eighteenth-century America. While the legislative history of the Compensation Clause is sparse, on one point there is no historical doubt: from the beginning of the republic to the present, the *'sacred principle of compensation'* has always been understood paradigmatically to express the state's obligation to indemnify owners of property taken through an assertion of eminent domain." (Rubenfeld, *Usings* (1993) 102 Yale L.J. 1077, 1081-1082, italics in original, fns. omitted.)

The California Constitution of 1879 added the phrase "or damaged" to the just compensation provision (Cal. Const., art. I, former § 14), but this change was not intended to expand the scope of the constitutional compensation provision beyond the ambit of eminent domain and public improvements. It appears, instead, that the words "or damaged" were added to clarify that the government was obligated to pay just compensation for property damaged in connection with the construction of public improvements, even if the government had not physically invaded the damaged property. (See generally, 2 & 2A Nichols on Eminent Domain (3d ed. 1990) §§ 6.22-6.26, pp. 6-157 to 6-190 [reviewing origin of "or damaged" clauses in various state constitutional provisions].)

Under the California Constitution of 1849, as at common law, the owner of property taken for a public use was entitled to compensation only if the government physically had invaded the property. (*Reardon* v. *San Francisco* (1885) 66 Cal. 492, 498-500 [6 P. 317].) A review of the debates at the Constitutional Convention of 1878-1879 reveals that the discussion of this aspect of the just compensation provision centered upon whether a physical invasion of the property would be a necessary predicate to the compensation required in this context. A proponent of adding the words "or damaged" to the just compensation provision explained his reasons as follows: "In some instances a railroad company cuts a trench close up to a man's house, and while they do not take any of his property, it deprives him of the use of it to a certain extent. This was brought to my notice in the case of the Second street cut in San Francisco. There the Legislature authorized a street to be cut through, which left the houses on either side high in the air, and wholly inaccessible. It was destroyed, although none of it was taken or moved away. There are many such cases, where a man's property may be materially damaged, where none of it is actually taken." (3 Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 1190.)

It seems apparent that the addition of the words "or damaged" to the 1879 Constitution was intended to clarify that application of the just compensation

provision is not limited to physical invasions of property taken for "public use" in eminent domain, but also encompasses special and direct damage to adjacent property resulting from the construction of public improvements. There is nothing that indicates the provision was intended to expand compensation outside the traditional realm of eminent domain, or to require the payment of just compensation for damage caused by the government's efforts to enforce the criminal laws.

Furthermore, the expansive interpretation of section 19 proposed by Customer is uniformly refuted by governing California authorities. In *Reardon* v. *San Francisco*, *supra*, 66 Cal. 492, the construction of a sewer in the street fronting the plaintiffs' property had compacted the soil, causing "displacement and destruction of the foundation" that had supported the plaintiffs' houses. This court, examining for the first time the addition of the words "or damaged" to the just compensation provision, concluded that the former requirement of a physical invasion of the property thereby had been eliminated: "If the word 'damaged' only embraced physical invasions of property, the right secured by this word would add nothing to the guaranty as it formerly stood." (*Id.* at p. 501.) Accordingly, the government was required to compensate the property owners for the consequential damage caused by the public improvement, despite the circumstance that there had been no physical invasion of the plaintiffs' property. (*Id.* at p. 506; *Tyler* v. *Tehama County* (1895) 109 Cal. 618, 625 [42 P. 240].)

In *Brown* v. *Board of Supervisors* (1899) 124 Cal. 274 [57 P. 82], compensation was denied to the owners of property abutting a public street that had been substantially narrowed, allegedly resulting in a diminution in the value of the plaintiffs' property. This court made clear that the addition of the words "or damaged" in the just compensation provision had not expanded that guarantee to include compensation for any and all damage to property: "The provision in the constitution [guaranteeing compensation for property 'damaged' for public use] invoked by the [plaintiffs] was inserted therein to provide for instances in which property was not taken from the possession of the owner, or into physical occupancy by the public, *and applies only to such damages as may be recoverable under established rules of law*. The damage which the [plaintiffs] may sustain by reason of a diminution in value of their lands is not damage for which they are entitled to compensation. [Citations.]" (*Id.* at p. 281, italics added.)

This court again narrowly interpreted the words "or damaged" in *Gray* v. *Reclamation District No. 1500* (1917) 174 Cal. 622 [163 P. 1024]. After repeating the general rule that damages resulting from a valid exercise of the state's police power are *damnum absque injuria* (i.e., a loss not giving rise to

a cause of action),[6] this court observed: "[W]hile it is unquestionably true that the addition of the word 'damaged' to our constitutional law governing the exercise of the right of eminent domain gives in many instances a right to compensation which did not formerly exist, it did not, touching the exercise of the police power, give a right of action for damages which theretofore were *damnum absque injuria*." (*Id.* at pp. 640-641.)

In the 115 years since the words "or damaged" were inserted into the just compensation provision, that guarantee never has been expanded in the manner proposed by Customer. In *Miller* v. *City of Palo Alto* (1929) 208 Cal. 74 [280 P. 108], the plaintiff's property was destroyed as a result of a fire caused by the city's allegedly careless disposal of incinerated garbage. The plaintiff sought damages from the city on two theories, negligence and inverse condemnation. Our court rejected the negligence action on the basis of the then existing doctrine of sovereign immunity, which barred such a tort action against the city. We then turned to the inverse condemnation claim, which rested upon a theory similar to Customer's contention in the present case—namely that the plaintiff's property had been "damaged" by an activity of the public entity conducted for the public benefit. The court in *Miller* unanimously rejected this contention in no uncertain terms: "There is no merit in appellants' contention that the injury of which they complain constitutes a taking of private property for public use. A public use is 'a use which concerns the whole community as distinguished from a particular individual or a particular number of individuals; public usefulness, utility or advantage; or what is productive of general benefit; a use by or for the government, the general public or some portion of it.' [Citation.]" (*Id.* at p. 77.)

The holding in *Miller*—that damage caused by the negligent conduct of public employees or a public entity does not fall within the aegis of section 19—has been followed repeatedly and uniformly in the more than 60 years that have elapsed since that decision was rendered. (*Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917, 920 [190 Cal.Rptr. 595]; *Eli* v. *State of California* (1975) 46 Cal.App.3d 233, 235-236 [120 Cal.Rptr. 63]; *Hayashi* v. *Alameda County Flood Control* (1959) 167 Cal.App.2d 584, 591-592 [334 P.2d 1048]; *Neff* v. *Imperial Irrigation Dist.* (1956) 142 Cal.App.2d 755, 757-758 [299 P.2d 359].) In *House* v. *L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384 [153 P.2d 950], which held that damage caused by the design of a public project gave rise to an inverse condemnation action, then

---

[6]"[T]he injury inflicted is without damage, and the damage without injury, curtly expressed in the maxim '*damnum absque injuria*.' The right of the owner of the property, who has sustained such damage, must yield to the promotion and advancement of the public good." (*Reardon* v. *San Francisco, supra,* 66 Cal. at p. 504.)

Justice Traynor was careful to explain that "[t]he destruction or damaging of property is sufficiently connected with 'public use' as required by the Constitution, if the injury is a result of dangers *inherent in the construction of the public improvement* as distinguished from dangers *arising from the negligent operation of the improvement.*" (25 Cal.2d at p. 396 (conc. opn. of Traynor, J.), italics added.)

Similarly, in *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 286 [289 P.2d 1], this court, after concluding that property owners could recover for the damage caused by floodwaters diverted onto their property by a public watercourse and drainage system, took pains to explain that application of the predecessor of section 19 did not "subject the state to general tort liability under the theory of eminent domain. The defendants contend that the imposition of a duty to compensate for improper maintenance of a public improvement would impose liability for the act of negligently forgetting to close a sluice gate or other negligent acts committed during the routine day to day operation of the public improvement. But the raising of a ditch bank appears on its face to be a deliberate act carrying with it the purpose of fulfilling one or another of the public objects of the project as a whole. . . . The damage to property in this instance resulted not from immediate carelessness but from a failure to appreciate the probability that, functioning as deliberately conceived, the public improvement as altered and maintained would result in some damage to private property. *Damage resulting from negligence in the routine operation having no relation to the function of the project as conceived is not within the scope of the rule applied in the present case.* (See *Miller* v. *City of Palo Alto*, 208 Cal. 74 . . . ; *McNeil* v. *City of Montague*, 124 Cal.App.2d 326 . . . ; *Western Asssurance Co.* v. *Sacramento & S.J. Drainage Dist.*, 72 Cal.App. 68 . . . ; anno. 2 A.L.R.2d 677.)" (Italics added.)

In *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129], this court, again considering the effect of the words "or damaged" in section 19, held that the owner of property abutting a public improvement was entitled to compensation where the property was damaged as a result of the construction of that public improvement. In *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441], we referred to our decision in *Albers* as follows: "In announcing our holding in *Albers* . . . , we did not overlook the competing considerations which caution against an open-ended, 'absolute liability' rule of inverse condemnation. Recognizing that 'fears have been expressed that compensation, allowed too liberally, will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost' [citation], we deemed it prudent to focus our policy inquiry on situations which shared a general

factual similarity with that present in *Albers*. Thus we limited our holding of inverse condemnation liability, absent fault, to 'physical injuries of real property' that were 'proximately caused' *by the improvement* as deliberately constructed and planned." (*Id.* at pp. 303-304, italics added, fn. omitted.)

In the present case, of course, the property damage for which Customer seeks to recover bears no relation to a "public improvement" or "public work" of any kind. Instead, the damage was caused by actions of public employees having "no relation to the function" of a public improvement whatsoever. As the foregoing cases demonstrate, property damage caused in such a manner never has been understood to give rise to an action for inverse condemnation in California, but rather has been treated as subject to the general tort principles applicable to governmental entities.[7]

Any doubt that an action for inverse condemnation will not lie in the present case is dispelled by consideration of those cases applying the so-called emergency exception to the just compensation requirement. The emergency exception has had a long and consistent history in both state and federal courts. It is a specific application of the general rule that damage to, or even destruction of, property pursuant to a valid exercise of the police power often requires no compensation under the just compensation clause. "[I]n its legitimate exercise the police power often works not only damage to property but destruction of property. Injury to property can and often does result from the demolition of buildings to prevent the spread of conflagration, from the abandonment of an existing highway, from the enforced necessity of improving property in particular ways to conform to police regulations and requirements. . . . And equally well settled and understood is the law that in the exercise of this same power property may in some, and indeed in many, instances be utterly destroyed. The destruction of buildings, of diseased animals, of rotten fruit, of infected trees, are cases that at once come to mind as applicable to both personalty and realty. Always the question in each case is whether the particular act complained of is without the legitimate purview and scope of the police power. If it be, then the complainant is entitled to injunctive relief or to compensation. If it be not, then it matters not what may be his loss, it is *damnum absque injuria* [damage without injury]." (*Gray* v. *Reclamation District No. 1500, supra,* 174 Cal. 622, 638-639; *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 24 [119 P.2d 1].)

---

[7]The foregoing discussion should make it clear that we do not agree with the dissent's assertion that the issue presented by this case is one of first impression in California. (Dis. opn., *post*, at p. 406.) On the contrary, the cited authorities make it clear that section 19 has been interpreted, consistently and repeatedly over the past century, not to apply to property damage caused by the type of governmental activity here at issue.

In *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 303, we noted the limits of the rule that compensation is not required for property damage resulting from a valid exercise of the police power. The plaintiffs in *Holtz* owned property abutting construction of a public transportation system—property that was damaged when extensive excavation deprived the plaintiffs' buildings of lateral support. In holding that the plaintiffs were entitled to compensation, we noted: "[T]he 'police power' doctrine '[g]enerally . . . operates in the field of regulation' . . . . [T]his doctrine of noncompensable loss comes into play in connection with more direct 'taking' or 'damaging' of property only under 'emergency' conditions; i.e., when damage to private property is inflicted by government 'under the pressure of public necessity and to avert impending peril.' [Citation.]" (*Id.* at p. 305.)

In *United States* v. *Caltex, Inc.* (1952) 344 U.S. 149 [97 L.Ed. 157, 73 S.Ct. 200], compensation was denied for an oil terminal facility in Manila that the United States Army destroyed immediately prior to the Japanese invasion of the Philippine Islands. The facility was demolished in order to deprive the enemy "of a valuable logistic weapon." (*Id.* at p. 151 [97 L.Ed. at pp. 160-161].) Similarly, in *United States* v. *Pacific R.R. Co.* (1887) 120 U.S. 227 [30 L.Ed. 634, 7 S.Ct. 490], compensation was denied for bridges destroyed during the Civil War by Union forces as the Confederate army advanced. As in *Caltex,* the bridges were destroyed "to prevent the advance of the enemy." (*Id.* at p. 229 [30 L.Ed. at p. 635.) Fifty years ago, in *House* v. *L. A. County Flood Control Dist., supra,* 25 Cal.2d 384, 391, we recognized: "Unquestionably, under the pressure of public necessity and to avert impending peril, the legitimate exercise of the police power often works not only avoidable damage but destruction of property without calling for compensation. . . . In such cases calling for immediate action the emergency constitutes full justification for the measures taken to control the menacing condition, and private interests must be held wholly subservient to the right of the state to proceed in such manner as it deems appropriate for the protection of the public health or safety. [Citation.]"[8]

In the same manner, law enforcement officers must be permitted to respond to emergency situations that endanger public safety, unhampered by

---

[8]The dissent states that the emergency exception does not apply in the present case because, in contrast, "[m]any, if not all," of the California and United States Supreme Court cases applying the emergency exception involved property that had become a nuisance and had "already lost its compensable value." (Dis. opn., *post,* at p. 418.) But this statement is not true as to three of the cases cited by the dissent in support of its assertion. The bridges at issue in *United States* v. *Pacific R.R. Co., supra,* 120 U.S. 227 were destroyed by the military to slow the advance of enemy troops, not because the bridges had become a nuisance or had lost any of their value. As explained by our high court: "The safety of the state in such cases overrides all considerations of private loss." (*Id.* at p. 234 [30 L.Ed. at p. 637].) Similarly, the cedar trees destroyed in *Miller* v. *Schoene* (1928) 276 U.S. 272 [72 L.Ed. 568, 48 S.Ct. 246] had not lost any of their value. Rather, they were deemed a nuisance and were destroyed simply because they harbored a pest harmless to cedar trees but ruinous to apple trees, which were of

the specter of constitutionally mandated liability for resulting damage to private property and by the ensuing potential for disciplinary action. This court never has sanctioned an action for inverse condemnation seeking recovery for incidental damage to private property caused by law enforcement officers in the course of efforts to enforce the criminal law. Permitting Customer to bring an action for inverse condemnation under the circumstances of the present case would constitute a significant, unprecedented, and unwarranted expansion of the scope of the just compensation requirement and might well deter law enforcement officers from acting swiftly and effectively to protect public safety in emergency situations.

The dissent would not apply the emergency exception in the present case because, it asserts, "the government itself was a substantial cause of the emergency." (Dis. opn., *post*, at p. 404.) We do not agree. The government did not create the situation of an armed and dangerous felon actively attempting to avoid capture, nor did the government cause that suspect to enter Customer's store or to refuse to leave when lawfully ordered to do so by the police.

It is true that the unplanned entrance of marked patrol vehicles into the store's parking lot altered Deputy Chapman's plan to wait until the suspect emerged from the store before attempting to arrest him. But, as the dissent appears to acknowledge, this action by the authorities did not constitute a taking of Customer's property within the meaning of section 19, because it constituted, at most, an act of "routine negligence." (Dis. opn., *post*, at pp. 420, 421-422.)[9]

The dissent states: "[T]he 'emergency' claimed by defendants, and the involvement of plaintiff's store in that emergency, were the sole and direct

---

greater commercial value. The high court recognized that, because the cedar trees and apple trees could not coexist in close proximity, the state was compelled to decide which would be sacrificed: "When forced to such a choice the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public." (*Id.* at p. 279 [72 L.Ed. at p. 571].) Finally, *Farmers Ins. Exchange* v. *State of California* (1985) 175 Cal.App.3d 494 [221 Cal.Rptr. 225] held the state was not required to compensate property owners for damage to the paint on their automobiles caused by aerial spraying intended to eradicate the Mediterranean fruit fly. Clearly, those vehicles did not constitute nuisances and had not lost their value prior to the spraying.

[9]Although the entry of the marked vehicles into the parking lot was unplanned, as events unfolded it did not necessarily turn out to be a poor strategy. Unknown to the officers at the time, the suspect had left his weapons in the stolen automobile and was unarmed while inside the store. Had the suspect been permitted to return to the automobile, he might have resisted arrest by firing his weapons, attempting to escape in the vehicle, or reentering the store while armed and taking the store clerk hostage. Deputy Chapman, noting that the suspect had vowed to "shoot it out" rather than be arrested, observed that any attempt to arrest the suspect after he left the store posed its own dangers and was not necessarily preferable to confronting the suspect while he was inside the store: "So, knowing that, I am assuming he would run from

result of the time, place, and manner in which defendants themselves decided to achieve the capture of a public enemy." (Dis. opn., *post*, at p. 421.) In other words, the government must be deemed to have "taken" Customer's property within the meaning of section 19 because the efforts of law enforcement officers to locate and capture a felony suspect resulted in the suspect's taking refuge in Customer's store. But the dissent would hold that section 19 does not apply where law enforcement officers attempt to apprehend a suspect caught in the act of committing a crime, because such action by the government would confer "a significant private benefit" upon the owner of the damaged property. (Dis. opn., *post*, at p. 416, fn. 8, italics omitted.)[10] The dissent's rationale suggests that had the police followed Nash until he attempted to commit another robbery, the government would be shielded from liability under section 19, but that acting to *prevent* such a future attempt on his part rendered the government liable. Not only is such a distinction untenable, but an effort to apprehend the suspect while he is engaged in the commission of a dangerous felony would pose no less a threat of damage to private property and a far greater one to the safety of innocent persons.

Customer relies upon decisions from two states that have construed constitutional provisions (similar to our section 19) to require public entities to compensate the owners of property damaged by law enforcement officers in the course of enforcing the criminal law. As explained below, we find these decisions unpersuasive.

*Wegner* v. *Milwaukee Mut. Ins. Co.* (Minn. 1991) 479 N.W.2d 38 [23 A.L.R.5th 954] involved a situation quite similar to that in the present case. A fleeing suspect took refuge in the plaintiff's residence. Police surrounded the house and, when the suspect ignored orders to surrender, fired tear gas canisters and "flash-bang" grenades into the residence—action resulting in

us in the car, and we'd have a vehicle pursuit, maybe shots fired, maybe collisions. It didn't really make much difference. . . . [¶] It was just whatever fell in place at the time, you go with it."

Obviously, there is no easy or safe method for apprehending an armed and dangerous suspect. Only a few days earlier, this suspect had detected the presence of an undercover officer in an unmarked vehicle and eluded the police by driving evasively. Although in the present case the suspect's refusal to surrender resulted in considerable and regrettable damage to Customer's property, it must be remembered that the law enforcement officers succeeded in apprehending an armed and dangerous suspect without anyone being killed or injured.

[10]It certainly could be argued that the government conferred a significant private benefit upon Customer by removing the barricaded suspect from its premises. Because Customer could not have operated the store while the suspect was hiding inside, allowing him to remain indefinitely (he had ample supplies of food and drink) eventually would have caused Customer to suffer an equal or greater economic loss, as well as posing an intolerable threat to public safety, both from the presence of the suspect inside the store and the diversion of a large proportion of the police force from its other duties.

the capture of the suspect, but causing damage to the plaintiff's home in the amount of $71,000. The plaintiff sought compensation under a provision of the Minnesota Constitution that closely resembles our section 19.[11] The Minnesota Supreme Court recognized "that this is not an eminent domain action and should not be analyzed as such" (479 N.W.2d at p. 40), but nonetheless appeared to apply eminent domain principles, concluding that just compensation was required because the city had "taken" the plaintiff's property for a public use. Rather than analyze and apply the law governing actions for inverse condemnation, however, the Minnesota court relied upon "policy considerations" to conclude that "the better rule, in situations where an innocent third party's property is taken, damaged or destroyed by the police in the course of apprehending a suspect, is for the municipality to compensate the innocent party for the resulting damages." (*Id.* at p. 42.) In reaching this conclusion, the court in *Wegner* placed primary reliance upon the decision of the Texas Supreme Court in *Steele* v. *City of Houston* (Tex. 1980) 603 S.W.2d 786.

In *Steele*, escaped prisoners took refuge in a house owned by the plaintiff. In order to capture the escapees, police set fire to the residence, destroying the home and its contents. Although observing that the case was not "one of eminent domain or inverse condemnation" (*Steele* v. *City of Houston, supra,* 603 S.W.2d at p. 789), the Texas Supreme Court relied upon a literal interpretation of that state's just compensation clause[12] and concluded, without citation to additional authority or supporting analysis, that the residence was taken "for the public use . . . by proof that the City ordered the destruction of the property because of real or supposed public emergency to apprehend armed and dangerous men who had taken refuge in the house." (*Steele* v. *City of Houston, supra,* 603 S.W.2d at p. 792.) But the court then appeared to recognize the traditional emergency exception to claims for just compensation by stating: "The defendant City of Houston may defend its actions by proof of a great public necessity. Mere convenience will not suffice." (*Ibid.*) In the next paragraph, however, the decision appears to contradict itself, suggesting without explanation or citation of authority that the property owner was entitled to compensation without a determination whether the police were responding to an emergency: "We do not hold that the police officers wrongfully ordered the destruction of the dwelling; we hold that the innocent third parties are entitled by the Constitution to compensation for their property." (*Id.* at p. 793.)

---

[11]Article I, section 13, of the Minnesota Constitution provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation, first paid or secured."

[12]Article I, section 17, of the Texas Constitution provides: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ."

The opinion in *Steele* is poorly reasoned and internally inconsistent. The opinion in *Wegner* relies primarily upon the faulty reasoning in *Steele*. Neither decision gives serious consideration to the body of authority governing actions for inverse condemnation. Accordingly, we decline to follow these decisions.

Moreover, the opinions in *Wegner* and *Steele* relied upon by Customer do not represent a consensus on the issue before us. To the contrary, nearly every other court to consider this question has held that constitutional just compensation principles do not apply to damages caused by law enforcement officers in the course of performing their duties. Courts have held that an action for inverse condemnation did not lie when police officers executing a search warrant and arrest warrant fired smoke grenades, tear gas canisters, and percussion and flash grenades into a rented residence, causing a fire that destroyed the residence (*Patel* v. *U.S.* (N.D.Cal. 1993) 823 F.Supp. 696, 699), when a police officer entered the plaintiff's automobile and ordered him to pursue another vehicle containing a fleeing suspect, and the plaintiff's vehicle was damaged during the chase when it collided with a parked truck (*Blackman* v. *City of Cincinnati* (1942) 140 Ohio St. 25 [42 N.E.2d 158, 160]), when police fired tear gas into the plaintiff's home to capture a felony suspect who had taken refuge there (*Indiana State Police* v. *May* (Ind.Ct.App. 1984) 469 N.E.2d 1183, 1184, disapproved on other grounds in *Tittle* v. *Mahan* (Ind. 1991) 582 N.E.2d 796, 800), when a volunteer's motor vehicle was damaged while he assisted law enforcement officers in searching for a weapon involved in a crime (*Bray* v. *Houston County* (1986) 180 Ga.App. 166 [348 S.E.2d 709, 710-711]), and when the police drained a pond on the plaintiff's property in search of a body, killing the plaintiff's fish and damaging the pond (*McCoy* v. *Sanders* (1966) 113 Ga.App. 565 [148 S.E.2d 902, 905]). Although the reasoning of these cases varies widely, each concludes that an action for inverse condemnation does not lie to recover damages to property caused by law enforcement officers in the course of performing their duties.

In the present case an action for inverse condemnation does not lie, because the efforts of the law enforcement officers to apprehend a felony suspect cannot be likened to an exercise of the power of eminent domain. This is not a case in which law enforcement officers commandeered a citizen's automobile to chase a fleeing suspect, or appropriated ammunition from a private gun shop to replenish an inadequate supply. Conceivably, such unusual actions might constitute an exercise of eminent domain, because private property would be taken for public use. (But cf. *Blackman* v. *City of Cincinnati*, *supra*, 42 N.E.2d 158, 160.) Nothing of this sort occurred in the present case, however. Application of the just compensation clause in

the present case would mean, for example, that every time a police officer fires a weapon in the line of duty, that officer exercises the power of eminent domain over any property that the officer reasonably could foresee might be damaged as a result. (See *YMCA* v. *United States* (1969) 395 U.S. 85, 92 [23 L.Ed.2d 117, 124, 89 S.Ct. 1511].)

To adopt Customer's position would be equivalent to holding that by adopting the "or damaged" clause in 1879, the voters abolished the then existing doctrine of sovereign immunity, at least as applied to damage to property. There is absolutely nothing in the history of the constitutional provision to support such a conclusion, however, and—from 1879 through the adoption of the Tort Claims Act in 1963—the Legislature and the courts of California uniformly interpreted the "or damaged" clause as *not* effecting such a general repeal of the governmental immunity doctrine. (See, e.g., *Miller* v. *Palo Alto, supra,* 208 Cal. 74, 75-77; *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457]; see generally, 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 115 et seq., pp. 190-191. [discussing the history of California's governmental immunity doctrine].)

Although in many circumstances it may appear "fair" to require the government to compensate innocent persons for damage resulting, for example, from routine efforts to enforce the criminal laws, inverse condemnation is an inappropriate vehicle for achieving this goal because it was not designed for such a purpose. Thus, for example, inverse condemnation is limited to damage to property and does not apply to damage involving personal injury. In the present case, for example, counsel for Customer acknowledged at oral argument that, under its proposed theory, although Customer would have a constitutional right to recover for damage to its store and its merchandise caused by the tear gas, had a store employee been on the premises, he or she could not recover, under the just compensation clause, for any personal injuries suffered as a result of the police use of tear gas. As explained below, this anomalous result—under which individuals would be afforded protection against property damage caused by tortious governmental conduct but not against personal injury caused by the same act—is avoided if governmental liability is evaluated, as it should be, under the provisions of the Tort Claims Act. (Gov. Code, § 810 et seq.)[13]

The anomaly of elevating claims for property damage above claims for personal injuries arising from the same type of governmental conduct is

---

[13]The dissent, acknowledging that its interpretation of section 19 would impose liability only for property damage and not for personal injury arising from the same act, asserts: "[T]here is no doubt that for profound historical reasons, the California Constitution, like its federal counterpart, is peculiarly concerned with the power and temptation of unchecked government to decree the uncompensated sacrifice of private property for the common benefit." (Dis. opn., *post,* at p. 416.) No authority is cited in support of the dissent's theory

exacerbated by the special provisions applicable to inverse condemnation actions. Because such suits originated as an adjunct to the law of condemnation (affording real property owners a remedy when the government takes or damages their property in the construction of a public works project without first condemning the property and compensating the owner), the remedies available in inverse condemnation actions are unusually generous to plaintiffs in several respects. ■ A prevailing plaintiff is entitled by statute to recover attorney fees. (Code Civ. Proc., § 1036.)[14] Even if the case is settled, the attorney representing the public entity that effects the settlement is required to include in the settlement a reasonable amount for attorney fees and other costs. In addition, the costs to which a prevailing plaintiff is entitled, whether the action is settled or proceeds to judgment, also are quite generous in encompassing all costs incurred from the time of the damage, including such items as appraisal and engineering fees. (8 Witkin, Summary of Cal. Law, *supra*, Constitutional Law, § 1062, p. 633.)

A prevailing plaintiff in an inverse condemnation action also is entitled to prejudgment interest. Such interest accrues not from the time the action is commenced, but from the time the damage occurs. (*Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 657 [131 Cal.Rptr. 646, 552 P.2d 430].) Because the plaintiff has a constitutional right to such prejudgment interest under the just compensation clause, the Legislature cannot restrict this right. (*Ibid.* ["[I]nterest must be computed from the date the taking or damaging was sustained in order to fulfill the constitutional mandate for just compensation. [Citations.]"]; *Heimann* v. *City of Los Angeles* (1947) 30 Cal.2d 746, 759 [185 P.2d 597].) The "ultimate determination of the rate of interest required for 'just compensation' is a judicial function." (*Redevelopment Agency* v. *Gilmore*, *supra*, 38 Cal.3d 790, 797.) The court must determine "the prevailing market rate" of interest in order to provide plaintiff the " '*full and perfect* equivalent of the property taken. [Citation.]' " (*Id.*, at pp. 796-797, italics in original.) Accordingly, Code of Civil Procedure sections 1268.311 and 1268.350, which provide that the rate of such prejudgment interest shall be based upon "the rate of earnings by the Surplus Money Investment Fund" for each six-month increment of the applicable

that the respective drafters of our state and federal Constitutions, with regard to the risk of harm posed by the type of governmental actions here at issue, for "profound historical reasons" afforded greater protection to private property than to the welfare of individuals.

[14]Code of Civil Procedure section 1036 provides: "In any inverse condemnation proceeding brought for the taking of any interest in real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, or the attorney representing the public entity who effects a settlement of such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will, in the opinion of the court or such attorney, reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding."

period, merely establish the *minimum* rate of prejudgment interest. (*People ex rel. Dept. of Transportation* v. *Diversified Properties Co. III* (1993) 14 Cal.App.4th 429, 451 [17 Cal.Rptr.2d 676].)

Allowing Customer to bring an action for inverse condemnation not only would permit Customer to seek recovery of its damages without complying with the requirements of the Tort Claims Act, including its immunity provisions,[15] but would allow Customer as well to seek recovery of its attorney fees and an award of prejudgment interest, neither of which would be available in a negligence action under the Tort Claims Act. Customer has alleged that the total property damage to its store exceeded $275,000. Customer's attorney fees up to this point total $360,000. Prejudgment interest for the alleged property damage, from the date of the injury, currently would total at least $185,784. Thus, the amount of attorney fees and prejudgment interest far eclipse the amount of Customer's property loss. We see no reason why a plaintiff seeking recovery for *property* damage should be permitted to obtain the additional benefit of attorney fees and prejudgment interest by bringing an action for inverse condemnation, while a plaintiff seeking recovery for *personal* injuries sustained by the *same* governmental conduct would not be entitled to such remuneration.

█ As noted at the outset of our opinion, a conclusion that the government's conduct in the present case does not give rise to an inverse condemnation action under section 19 does not necessarily mean that California law precludes a property owner, like Customer, from recovering damages under the circumstances involved in this case. Instead, the government's potential liability for this type of conduct properly should be evaluated, as it always has been in the past, under the provisions of the Tort Claims Act. (Gov. Code, § 810 et seq.) In enacting the elaborate and detailed provisions of that act, the Legislature carefully considered the competing considerations that arise from the imposition of liability upon the government in various tort settings, and deliberately fashioned immunity provisions designed to avoid deterring the government from proceeding with the enforcement of important public policies. As noted above, to allow Customer to bring an action for inverse condemnation would "trump" all of the immunity provisions set forth in the Tort Claims Act.

In the present case, Customer alleged a cause of action for negligence under the Tort Claims Act in addition to its inverse condemnation claim, but

---

[15]Such an expansion of the takings clause of our state Constitution effectively would nullify all applicable governmental immunity statutes, such as Vehicle Code section 17004.7, which governs vehicular pursuits, and Government Code section 820.2, which immunizes discretionary governmental acts.

the superior court and the Court of Appeal concluded that the defendant public entities were immune from such tort liability, pursuant to Government Code section 820.2, which (as noted above) provides immunity for those acts and omissions of public employees resulting from their "exercise of discretion." Customer did not seek review from this portion of the Court of Appeal's ruling. Following oral argument, we requested supplemental briefs addressing whether Customer would be entitled to relief under the Tort Claims Act. In its supplemental brief, however, Customer expressly "waived the right to relief under the Tort Claims Act," offering the following reason for this waiver: "[Customer]'s attorneys fees and costs to date in this matter total $360,000. . . . [Customer] is not willing to incur the additional expense of a trial of the issues whether the police acted negligently, a trial in which even if [Customer] prevails it will be required to pay its attorney's fees." As noted above, were Customer to prevail in its cause of action for inverse condemnation, it would be entitled to recover its attorney fees.

In order to determine whether Customer could recover under the Tort Claims Act, we would have to decide whether the superior court and the Court of Appeal were correct in concluding that City and County are immune from liability pursuant to Government Code section 820.2, which provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused," and Government Code section 815.2, subdivision (b), which provides that "[e]xcept as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."

This court has held that Government Code section 820.2 "confers immunity only with respect to those 'basic policy decisions' which have been committed to coordinate branches of government, and does not immunize government entities from liability for subsequent ministerial actions taken in the implementation of those basic policy decisions [citation]." (*Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 793 [221 Cal.Rptr. 840, 710 P.2d 907].) But we have not resolved whether the selection of the means employed to effectuate an arrest is such a "basic policy decision" to which the immunity applies. (See *ibid.*; *Nunn* v. *State of California* (1984) 35 Cal.3d 616, 622 [200 Cal.Rptr. 440, 677 P.2d 846]; *Sanborn* v. *Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 414-415 [134 Cal.Rptr. 402, 556 P.2d 764]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 445 [131 Cal.Rptr. 14, 551 P.2d 334]; *McCorkle* v. *City of Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453]; *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 797 [73 Cal.Rptr. 240, 447 P.2d 352].) In light of

Customer's express waiver of its negligence claim, it would be inappropriate for us to decide in the present case whether the immunity provisions of Government Code section 820.2 apply under the circumstances of the present case.

We observe that one remaining avenue may be open to property owners in Customer's position. They may be able to secure reimbursement for all or part of their loss from the public entity under a statutorily authorized program established to aid victims of crime. The Legislature has enacted Government Code sections 29631 and 29632, which specifically authorize cities and counties to establish reimbursement programs for damage to the property of "innocent residents" caused by peace officers engaged in detecting crime or apprehending suspects.[16] Property owners such as Customer appear to fall within the category of innocent victims these statutorily authorized programs were designed to benefit. It is worth noting that these statutes, and the reimbursement programs they authorize, would be unnecessary if Customer were correct in its assertion that public entities are required by section 19 to compensate property owners for the damage they suffer as the result of efforts by law enforcement officers to enforce the criminal laws.

For the foregoing reasons, we hold that the superior court properly granted judgment on the pleadings, in favor of the City and the County, on Customer's cause of action for inverse condemnation.

IV

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., and Werdegar, J., concurred.

**KENNARD, J.,** Concurring.—In this case, the Customer Company (hereafter Customer Co.) seeks compensation for damage to one of its convenience

---

[16]Government Code section 29631 states: "The Legislature hereby declares that it serves a public purpose, and is of benefit to the state and to every county and city in the state, to indemnify those innocent residents of the State of California whose property has been injured or destroyed as a result of the acts specified in Section 29632."

Government Code section 29632 states: "The legislative body of a county or of a city may establish a program which provides for the reimbursement of any innocent resident . . . whose property is or has been . . . injured or destroyed as the consequence of: [¶] (a) An act of a peace officer in the detection of crime or the apprehension or arrest of any person for any public offense; or [¶] (b) An act of a person in resisting or avoiding arrest."

Government Code section 29636 provides that a court may order a person convicted "of a crime which has resulted in the injury or destruction of property for which reimbursement is provided for under a program established pursuant to this article . . . to pay a fine in an amount sufficient to pay for the replacement or repair of the property injured or destroyed . . . ." A portion of such fine shall be used to pay claims pursuant to that reimbursement program.

store buildings and to food and other merchandise inside the building. The damage was caused when police officers fired tear gas into the store to dislodge a fugitive hidden inside. Customer Co. bases its claim on the "just compensation" clause of the California Constitution (article I, section 19), which gives a right to just compensation when "[p]rivate property [is] taken or damaged for public use." I agree with the majority that our precedents interpreting the just compensation clause provide no support for the view that Customer Co. has a right to compensation in this case, and I join in the majority opinion.

The majority's historical survey of just compensation cases focuses on the words "taken or damaged" in the constitutional provision for just compensation, and demonstrates that those words have never been construed to encompass property destroyed in the course of law enforcement activities. The cases the majority surveys, however, do not set forth a coherent and consistent analysis of the limits of just compensation that explains why there is no right to compensation in this case. Nor is this surprising, for legal commentators have long described the law of just compensation, under both the California Constitution and the analogous federal constitutional provision, as a field of doctrinal incoherence littered with differing and inconsistent rationales.[1]

Notwithstanding the confusion that characterizes this area of the law, in my view there is a straightforward analytic basis for explaining why Customer Co.'s claim for compensation falls outside the scope of our constitutional provision for just compensation. Unlike the majority, I would focus on the word "use" in the constitutional text. The just compensation clause of the state Constitution does not impose liability in every case in which the government takes or damages property, but only when the government puts the property to some "use." (Cal. Const., art. I, § 19.) Here, the police did not, in any meaningful sense of the word, use the store windows that they broke or the food and beverages that they contaminated with tear gas.

---

[1](See, e.g., Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 431-432 ["[I]nverse condemnation . . . is entangled in a complex web of doctrinal threads. . . . [J]udicial opinions seldom seek to reconcile these divergent approaches." (Fn. omitted.)]; Van Alstyne, *Statutory Modification of Inverse Condemnation: Deliberately Inflicted Injury or Destruction* (1968) 20 Stan.L.Rev. 617, 618 ["[A] disorderly and frequently inconsistent array of judicial decisions on the compensability of claimed losses." (Fn. omitted.)]; Sax, *Takings and the Police Power* (1964) 74 Yale L.J. 36, 37 ["[T]he predominant characteristic of this area of law is a welter of confusing and apparently incompatible results."]; Peterson, *The Takings Clause: In Search of Underlying Principles (Part 1)* (1989) 77 Cal.L.Rev. 1299, 1304 ["it is difficult to imagine a body of case law in greater doctrinal and conceptual disarray"]; Rubenfeld, *Usings* (1993) 102 Yale L.J. 1077, 1081 ["only the right of privacy can compete seriously with takings law for the doctrine-in-most-desperate-need-of-a-principle prize"].)

Because in this case there was no use by the government of the property that was destroyed, there is no right to compensation under the state Constitution's just compensation clause.

This does not mean, however, that those whose property is destroyed by government action are left without any remedies whatsoever. Not only the Tort Claims Act (Gov. Code, § 810 et seq.), which the majority discusses, but also the federal civil rights statute (42 U.S.C. § 1983; hereafter section 1983) provide damages remedies for governmental deprivations of property. In particular, section 1983 provides a remedy for damage or destruction of property by law enforcement agents that violates the Fourth Amendment or the due process clause of the federal Constitution.

## I

Plaintiff Customer Co. operates a chain of convenience stores. A wanted fugitive entered one of Customer Co.'s convenience stores in Sacramento. The store was surrounded by police from the City of Sacramento and by sheriff's deputies from Sacramento County. The fugitive refused to leave the store. The police officers fired tear gas into the store, breaking plate glass windows, damaging the store's interior, and contaminating food and other items in the store's inventory with tear gas residue.

Customer Co. sued the City of Sacramento and Sacramento County (hereafter collectively referred to as Sacramento), seeking to recover for the damage to its store and the store's contents. Customer Co. alleged a claim for inverse condemnation under the just compensation clause of the California Constitution (art. I, § 19) as well as various tort claims and a federal civil rights claim under section 1983 (42 U.S.C. § 1983). The superior court granted summary judgment for Sacramento on all of Customer Co.'s claims. The judgment was affirmed on appeal.

In this court, Customer Co. seeks relief solely on the basis of the just compensation clause of the California Constitution. It has expressly abandoned its other theories of relief that it raised in the trial court.

## II

The text of the just compensation provision of the California Constitution is found in section 19 of article I (hereafter section 19), which provides in relevant part: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

Section 19 was not intended to provide compensation for every government-caused injury to property. As the majority demonstrates, our prior cases interpreting this constitutional provision have never recognized any right to compensation for property destroyed in the course of law enforcement activities, as Customer Co.'s property was. Why is it, however, that the just compensation clause does not provide compensation under these circumstances?

In my view, a sound understanding of the just compensation clause begins by returning to the words of the constitutional text. In interpreting constitutional provisions, we must give significance to every word. (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935].) As I noted at the outset, the majority focuses on the words "taken or damaged" in section 19 and shows their historical limitation to cases of eminent domain or consequential damages from public improvements. There is another word of significance in section 19, however, and that is the word "use." Section 19 requires that just compensation be paid only for "private property . . . taken or damaged for public *use*." (Italics added.) Section 19 thus does not require just compensation every time property is taken or damaged by the government, but only requires compensation if there is some *use* by the government of the property that it has taken or damaged. Customer Co.'s argument for compensation is fundamentally defective because it ignores the threshold requirement of section 19 that the government put to some use the property it takes or damages.

Deciding whether a particular governmental action not only takes or damages property but also amounts to a "use" of that property may be a difficult question in some cases, especially those involving the regulation of property.[2] Here, however, the items of property for which Customer Co. seeks compensation were not regulated or appropriated but were physically destroyed by the government.

---

[2]It is clear, however, that the government need not physically occupy property or assert legal ownership of a recognized property interest in order to put private property to use. For example, when the government enacts a regulation that has the effect of dictating an exclusive, government-determined use for a particular parcel of land, it "uses" that property just as much as if it had acquired ownership of the land. The United States Supreme Court has noted "the practical equivalence in this setting of negative regulation and appropriation." (*Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. 1003, __ [120 L.Ed.2d 798, 815, 112 S.Ct. 2886, 2895].) It has observed that "regulations that leave the owner of land without economically beneficial or productive options for its use—typically, as here, by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service" or, in other words, is being put to some use by the government. (*Id.* at pp. __-__ [120 L.Ed.2d at p. 814, 112 S.Ct. at pp. 2894-2895].) On the other hand, there may be certain exceptional situations where even the government's physical occupation of land does not amount to a "use" of the land. (See *Brown* v. *State of California* (1993) 21 Cal.App.4th 1500, 1504 [26 Cal.Rptr.2d 687] [holding that no compensation was due for state's occupation of a privately owned parcel of land for 10 years

In the context of property that the government physically destroys, the "use" requirement is, in the words of one commentator, "the difference between merely depriving someone of something and putting that thing to use by exploiting some productive capacity it possesses. . . . [It] requires a utilization of property going beyond mere deprivation . . . ." (Rubenfeld, *Usings, supra,* 102 Yale L.J. 1077, 1115.) Thus, "there is a taking *for public use* only when government exploits some productive attribute or capacity of private property for state-mandated service . . . ." (*Id.* at p. 1113, italics original.) Accordingly, whatever limits on the right to compensation the use requirement may impose in other contexts, it generally precludes compensation when property is destroyed by the government without having been appropriated and put to some use.

This court applied this understanding of "use" in denying compensation for the government-caused destruction of a home in *Miller* v. *City of Palo Alto* (1929) 208 Cal. 74, 77 [280 P. 108]. In that case, a city's disposal of smoldering incinerator ashes in a vacant lot caused a fire which destroyed the plaintiffs' house. This court held that the plaintiffs were not entitled to compensation under the just compensation clause of the state Constitution because the city's destruction of their house did not put the house to a " 'use by or for the government' " or put it to any " 'utility or advantage.' " (*Ibid.*)

The United States Supreme Court has similarly denied compensation under the just compensation clause of the federal Constitution in cases in which property was destroyed by the government but not put to any use by it. For instance, in *United States* v. *Caltex, Inc.* (1952) 344 U.S. 149 [97 L.Ed. 157, 73 S.Ct. 200], the high court denied compensation for a refinery that the government had destroyed with " 'deliberation' " in advance of Japanese occupation, because "[i]t was destroyed, *not appropriated for subsequent use*" (*id.* at p. 155 [97 L.Ed. at p. 163], italics added). The court distinguished other cases in which compensation had been required for property commandeered by the military by noting that those cases "involved equipment which had been impressed by the Army for subsequent *use* by the Army." (*Id.* at p. 153 [97 L.Ed. at p. 161], italics added.) Thus, even in the midst of war the government must pay compensation if it takes a farmer's hay to feed its horses (no matter how pressing its need for the hay), but not if it destroys the hay crop by marching its soldiers through the hayfield. (See *United States* v. *Pacific R.R. Co.* (1887) 120 U.S. 227, 239 [30 L.Ed. 634, 638, 7 S.Ct. 490] [distinguishing "the exemption of government from liability for private property injured or destroyed during war, by the operations of armies in the field, or by measures necessary for their safety and

in order to clean up hazardous waste on the property, because the state's occupation was not a use of the land].)

efficiency" from the right to compensation "where property of loyal citizens is taken for the service of our armies, such as vessels, steamboats, and the like, for the transport of troops and munitions of war; or buildings to be used as storehouses and places of deposit of war material, or to house soldiers or take care of the sick, or claims for supplies seized and appropriated"].)

Likewise, in *Miller* v. *Schoene* (1928) 276 U.S. 272 [72 L.Ed. 568, 48 S.Ct. 246], the United States Supreme Court upheld a state's action in compelling the physical destruction without compensation of valuable trees that the state did not put to any use. Miller's red cedar trees were susceptible to cedar rust, a disease harmless to Miller's cedars but injurious to nearby apple orchards. The state required Miller to destroy her cedar trees but it did not put them to any use; the high court held that the destruction of Miller's cedars without compensation was constitutional. (*Id.* at pp. 277-278 [77 L.Ed. at pp. 570-571].) Thus, the question of whether the property has been used has been a deciding factor for the high court in determining whether the government must provide compensation for property that it has destroyed.[3]

Applying the constitutional provision's "use" requirement here makes this a straightforward case. The items of property for which Customer Co. seeks recovery are its damaged windows, doors, and ceiling and its tear-gas-contaminated inventory. Although these items were damaged or destroyed, they were not used by the government; the police officers did not exploit any productive attribute or capacity of the property they damaged or destroyed. The officers did not use the food and beverages they contaminated, nor did they use the windows, doors, and ceiling they shattered. The damaged property did not aid the officers in their efforts to capture the fugitive, and the officers would have acted the same had the damaged property not been present at all. As in *Miller* v. *City of Palo Alto*, the destroyed property was

---

[3]The question of whether the government has made use of property has also been determinative of whether compensation is required in other contexts. (Compare *United States* v. *Causby* (1946) 328 U.S. 256, 264 [90 L.Ed. 1206, 1211-1212, 66 S.Ct. 1062] [landowner had right to compensation for United States military overflights at height of 83 feet during takeoffs and landings; "the flight of airplanes which skim the surface but do not touch it, is as much *an appropriation of the use* of the land as a more conventional entry upon it" (italics added)] with *Hamilton* v. *Kentucky Distilleries Co.* (1919) 251 U.S. 146, 157 [64 L.Ed. 194, 199-200, 40 S.Ct. 106] [prohibition of liquor sales that rendered liquor valueless was not taking of liquor for public use because "[t]here was no *appropriation* of the liquor for public purposes" (italics added)]; compare *United States* v. *Pewee Coal Co.* (1951) 341 U.S. 114, 117 [95 L.Ed. 809, 813-814, 71 S.Ct. 670] [government seizure of coal mine to continue its operations during wartime labor dispute was compensable taking for public use because government thereby "engaged in the mining business"] with *United States* v. *Central Eureka Mining Co.* (1958) 357 U.S. 155, 165-166 [2 L.Ed.2d 1228, 1234-1236, 78 S.Ct. 1097] [no right to compensation where government ordered gold mines closed for duration of war but "did not occupy, *use*, or in any manner take physical possession of the gold mines" (italics added)].)

not put to any " 'utility or advantage' " (*Miller* v. *City of Palo Alto, supra,* 208 Cal. at p. 77), nor was it "affirmatively conscripted into service for a state-dictated use" (Rubenfeld, *Usings, supra,* 102 Yale L.J. at pp. 1112-13).

Because in this case Sacramento did not put the property it destroyed to any affirmative, productive use, Customer Co. has no right to compensation under the just compensation clause. Like the refinery in *United States* v. *Caltex, Inc.* and the cedar trees in *Miller* v. *Schoene,* Customer Co.'s property was "destroyed, not appropriated for subsequent use" by the government. (*United States* v. *Caltex, Inc., supra,* 344 U.S. at p. 155 [97 L.Ed. at pp. 162-163].)

Characterizing the capture of the fugitive here as a public benefit does not transform the government's destruction of Customer Co.'s property into a use of that property by the government, as I shall explain. There was a collateral public benefit in *United States* v. *Caltex, Inc., supra,* 344 U.S. 149 [97 L.Ed. at pp. 159-160], from the government's destruction of the refinery before the Japanese could capture it and take it over for their use, just as there was a collateral public benefit in *Miller* v. *Schoene, supra,* 276 U.S. 272, from the destruction of Miller's cedar trees to prevent them from serving as a host for the cedar rust that threatened the nearby apple orchards, and just as there was a collateral public benefit in *Miller* v. *City of Palo Alto, supra,* 208 Cal. 74, from the municipal garbage incineration that caused the destruction of the plaintiff's house. As in those cases, however, any collateral benefit here to Sacramento from the law enforcement activity it was pursuing did not arise from a *use* of the items of property for which Customer Co. is seeking compensation.[4]

The "use" requirement is a central part of the constitutional text. To ignore it is to turn the just compensation clause into a facially open-ended

---

[4]The dissent contends that the government " 'use[s]' . . . the damaged property . . . in every case where deliberate government conduct undertaken for public benefit physically . . . destroys, or damages private property." (Dis. opn., *post,* at p. 415.) In doing so, the dissent erroneously confuses "use" of property with "public benefit" from governmental conduct affecting property. As this court recognized in *Miller* v. *City of Palo Alto, supra,* 208 Cal. at page 77, and as the United States Supreme Court has recognized in the cases cited in the text, however, the meaning of "use" is more limited than the dissent acknowledges. Those cases establish that, contrary to the dissent, the government can destroy or damage property without putting it to use. Nor do the cases cited by the dissent support its equation of use with public benefit. Instead, the cited language addresses not whether the government has put property to use but whether the use was public or private (*City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60, 69 [183 Cal.Rptr. 673, 646 P.2d 835, 30 A.L.R.4th 1208]; *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 284 [289 P.2d 1]) or what the proper measure of damages is for a compensable taking or damaging of property (*Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 263 [42 Cal.Rptr. 89, 398 P.2d 129]).

The dissent also argues that a right to compensation arises whenever "physical injury is the incidental consequence of deliberate government action in furtherance of public *purposes.*" (Dis. opn., *post,* at p. 415, fn. 7, italics original.) It relies, however, on cases of this court

right to compensation for any government action that affects the value or use of private property. By contrast, if the word "use" in the constitutional text is given its ordinary meaning, the just compensation clause by its own terms no longer threatens absolute liability for any and all government interference with private property. It becomes a self-limiting constitutional provision.

Apart from the role of the word "use" in the constitutional text, one might ask why "use" is a sensible boundary for deciding which government takings or damagings of property should be compensated. The answer may lie in the function performed by the just compensation clause in preserving the autonomy of individuals against the government by restraining the government's motive to take over their private property for its own ends and uses. (See Rubenfeld, *Usings, supra,* 102 Yale L.J. at pp. 1142-1146.) The role of this function can be seen by contrasting the operation of the just compensation clause with that of another constitutional restriction on the government's power over private property, due process.

The due process clauses of the state and federal Constitutions (Cal. Const., art. I, § 7; U.S. Const., Amend. 14, § 1) generally require that the government provide notice and an opportunity to be heard before it deprives a person of property; it also prohibits arbitrary and unreasonable deprivations of property. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306-307 [19 Cal.Rptr.2d 544, 851 P.2d 826]; *Memphis Light, Gas & Water Div.* v. *Craft* (1978) 436 U.S. 1, 19 [56 L.Ed.2d 30, 45, 98 S.Ct. 1554]; *Village of Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365, 395 [71 L.Ed. 303, 313-314, 47 S.Ct. 114, 54 A.L.R. 1016].) When the government causes a deprivation of property but does not benefit from the deprivation by putting the property to use for its own ends, the protections of due process generally suffice to protect against excessive or erroneous deprivations of property because the government has no self-interested motive to take over the property; from that standpoint, it is

---

involving public improvements in which: (1) the damaged real property was itself put to use as a site for storing or conveying water (*Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Bauer* v. *County of Ventura, supra,* 45 Cal.2d 276; *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 637-638 [220 P.2d 897]); or (2) consequential damages resulted either from the government's use of private land to provide lateral support for public improvements (*Reardon* v. *San Francisco* (1885) 66 Cal. 492 [6 P. 317] [consequential damage to structure on private land resulted when government, by depositing fill on public roadway, caused soil on adjoining private land to rise until it provided lateral support to roadway]; *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250 [damage to hillside homes caused by using privately owned hillside to support earth placed at top of hill by the government]) or from the government's removal, in connection with a use of its land, of earth that provided lateral support to adjoining private land (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441]). By contrast, in this case and in the cases I cited earlier in the text, the government did not use the property it destroyed, nor did the destruction occur as a form of consequential damage from an accompanying use of land, either in connection with a public improvement or otherwise.

indifferent to the outcome of the decision as to whether or not deprivation should occur.

The just compensation clause in effect recognizes that governmental deprivations of property by which the government thereby acquires something of value to the government—something that it puts to *use*—are a special category of deprivation in which the protections of due process are not a sufficient safeguard. (See Rubenfeld, *Usings, supra,* 102 Yale L.J. at p. 1119 [Discussing the analogous provisions of the federal Constitution: "Recall, moreover, what immediately precedes the Compensation Clause: a provision expressly dealing with *deprivations* of property—the Due Process Clause—demanding certain protections in the event that property is taken *away* [by the government]. The Compensation Clause then follows, making special provision for a specific class of deprivations: cases in which private property is not merely taken, but taken *for public use."* (Italics original.)].) Simply put, the government has a strong motive for taking property it can put to some use; a motive that is lacking in the case of property for which the government has no use. If compensation were not mandated when the government takes property that it puts to use, this motive would lead the government to acquire without limit property for its own use, and would create an unavoidable conflict of interest between the government's due process obligations to the property owner and the government's interest in acquiring property for its own use without cost.

By making compensation mandatory in cases where the government uses the property it takes, the requirement of just compensation acts as a check on the government's appetite for property that it can put to use, an appetite that otherwise could consume both the realm of private property and the political autonomy of the individual against the government. (See *Chicago, Burl. & Quincy R.R.* v. *Chicago* (1897) 166 U.S. 226, 237 [41 L.Ed. 979, 985, 17 S.Ct. 581] ["[A] government, by whatever name it was called, under which the property of citizens was at the absolute disposition and unlimited control of any depository of power, was, after all, but a despotism . . . ."]; *House* v. *L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 391 [153 P.2d 950] ["It is a principle of universal law that wherever the right to own property is recognized in a free government, practically all other rights become worthless if the government possesses an uncontrollable power over the property of the citizen." (Lead opn.)]; Rubenfeld, *Usings, supra,* 102 Yale L.J. at pp. 1144-1145 ["If the state had unrestrained authority to direct the use of private property, its power to dictate the shape of society and the course of individual lives would be almost limitless."].) The contours of compensation liability drawn by the "use" requirement thus reflect the unique threat posed by the government's incentive to take property that it can use.

## III

In this court, Customer Co. has expressly abandoned any possible ground for compensation other than the just compensation clause of the California Constitution. We cannot, however, permit Customer Co.'s concessions to limit our view of the question before us. In approaching the problem of government-caused destruction of private property it is a mistake to view the just compensation clause as the sole restraint upon governmental actions affecting private property or as the sole remedy for losses caused by the government to private property. Rather, it is important to recognize both that the just compensation clause is only one of a number of constitutional provisions, both federal and state, limiting government actions affecting private property and that other remedies exist for government-caused injuries to property.

The majority notes one potential avenue of relief, the Tort Claims Act. (Gov. Code, § 810 et seq.) But there exists another potential remedy for the type of government-caused injury to property that occurred in this case. Section 1983, the federal civil rights statute, provides a remedy in damages for actions of state and local government that result in a "deprivation of any rights, privileges, or immunities secured by the [federal] Constitution."[5] (42 U.S.C. § 1983.) Depending on the circumstances, state action that damages or destroys private property may violate the due process clause of the Fourteenth Amendment of the federal Constitution or the Fourth Amendment's prohibition of unreasonable seizures. Such unconstitutional state action can thus give rise to liability under section 1983 as the "deprivation of [a] right[] . . . secured by the Constitution."

Either procedural or substantive due process violations can give rise to a section 1983 cause of action. Procedural due process requires government officials to provide a hearing before depriving individuals of property if "the officials know no emergency exists, or . . . act with reckless disregard of the actual circumstances." (*Sinaloa Lake Owners Ass'n* v. *City of Simi Valley* (9th Cir. 1989) 882 F.2d 1398, 1406.) Substantive due process prohibits government officials, regardless of the procedural safeguards they employ, from taking or destroying property when to do so is " 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " (*Id.* at p. 1407.)

---

[5]"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (§ 1983.) Attorney fees are available to a prevailing plaintiff in a section 1983 action under 42 United States Code section 1988.

The Fourth Amendment is another source of protection against government interference with or destruction of property; it prohibits unreasonable seizures of "houses . . . and effects" by the government. (U.S. Const., Amend. 4.) Any meaningful interference with an individual's possessory interests in property is a seizure within the meaning of the Fourth Amendment. (*Sodal* v. *Cook County* (1992) 506 U.S. 56, __ [121 L.Ed.2d 450, 457-459, 113 S.Ct. 538, 543].) The damaging or destruction of property by police during law enforcement activities is therefore a seizure. If the police act unreasonably in causing the damage or destruction they violate the Fourth Amendment, and the property owner may seek compensation for the destruction by means of a section 1983 action. (506 U.S. at pp. __, __-__ [121 L.Ed.2d at pp. 457-459, 463-465, 113 S.Ct. at pp. 543, 548-549].) In *Sodal* v. *Cook County*, sheriff's deputies participated in a trailer park eviction during which a mobilehome was uprooted and towed to another location, damaging it in the process. (*Id.* at pp. __-__ [121 L.Ed.2d at pp. 456-457, 113 S.Ct. at pp. 541-542].) The United States Supreme Court held that the mobilehome had been seized within the meaning of the Fourth Amendment, and that the mobilehome owner could thus bring suit under section 1983 for the damage caused to the mobilehome by its forcible relocation. (506 U.S. at p. __ [121 L.Ed.2d at p. 465, 113 S.Ct. at p. 549].)

Thus, law enforcement activities that unreasonably damage or destroy property, thereby seizing it within the meaning of the Fourth Amendment, can give rise to liability under section 1983. In *Bonds* v. *Cox* (6th Cir. 1994) 20 F.3d 697, 702, a homeowner stated a section 1983 claim by alleging the police violated the Fourth Amendment when in the course of executing a search warrant they caused damage to her home and belongings, "which included broken doors, mutilated vinyl siding, a cracked commode, holes in walls, broken dishes, and trampled personal belongings . . . ." Likewise, in *Fuller* v. *Vines* (9th Cir. 1994) 36 F.3d 65, the police during an altercation with the plaintiff shot and killed the plaintiff's dog. The plaintiff stated a section 1983 claim by alleging that the destruction of his dog by the police was an unreasonable seizure in violation of the Fourth Amendment. (36 F.3d at pp. 67-68.)

CONCLUSION

The just compensation clause of the state Constitution requires compensation only when the government puts to some "use" the property that it takes or damages. (§ 19.) The Customer Co.'s assertion that whenever property is destroyed by deliberate law enforcement activities, the government has thereby necessarily put the property to use would read the word "use" and the limitation it imposes on the scope of compensation liability out of the Constitution.

We are required, however, by settled principles of constitutional interpretation to accord meaning to the word "use." Because in this case the police did not make any use of the property they destroyed, Customer Co. has no right to compensation under the just compensation clause.

Finally, it bears emphasizing that the just compensation clause is not the only constitutional provision that limits governmental actions affecting private property, nor is it the only potential monetary remedy available when government deprives someone of property.

I would affirm the judgment of the Court of Appeal for these reasons as well as for those stated by the majority.

**BAXTER, J.,** Dissenting.—Plaintiff's sound and valuable store premises were physically damaged, and its entire stock of lawful and wholesome merchandise was effectively destroyed, when the police, having trapped a suspected armed and dangerous felon inside, fired tear gas into the store to force his surrender. Plaintiff concedes that the authorities may have acted reasonably, and that their conduct may be immune by statute from a lawsuit sounding in tort. Nonetheless, plaintiff contends that reimbursement is due under article I, section 19, of the California Constitution (hereafter sometimes article I, section 19), which provides that "[p]rivate property may be *taken or damaged* for *public use* only when just compensation . . . has . . . been paid to . . . the owner." (Italics added.)

Plaintiff's constitutional claim was rejected by the lower courts, and the majority here affirm that result. They hold that the requirements of article I, section 19, apply only to the government's exercise of its eminent domain power. Hence, they reason, the clause never requires compensation for physical damage inflicted by legitimate exercises of the police power, never when the government's action was compelled by "emergency" or "necessity," and never where the mere negligence of public employees may be at issue.

Neither the majority's premise nor its conclusions can be sustained. Both the specific language of article I, section 19, and the modern history of the just compensation requirement imply that when the government deliberately chooses the physical sacrifice of unoffending private property in order to achieve a public purpose, its obligation to pay compensation does not depend upon whether its conduct was tortious, or upon arbitrary distinctions between the eminent domain and police powers. Moreover, any legitimate basis for an "emergency exception" is not established where, as here, the government itself was a substantial cause of the emergency. I therefore dissent.

## I.

As the majority acknowledge, the physical and chronological facts are not in substantial dispute. The majority recite in detail the sequence of events *during the standoff with the suspect*, apparently to demonstrate why a tear gas barrage was necessary to end the confrontation. However, the majority give shorter shrift to the events which caused the suspect to barricade himself inside the store. These events, I submit, show the degree to which acts and decisions by the law enforcement agents themselves helped precipitate the crisis.

For some considerable period of time, officers of the Sacramento County Sheriff's Department (County) and the Sacramento Police Department (City) had suspected Christopher Nash of participation in a series of armed robberies. An informant had advised that Nash might be driving a stolen vehicle, that he was constantly armed, that "he would shoot it out with law enforcement if he had to," and that he was committing bizarre and violent acts while at large.

On Friday, June 19, 1987, three days before the incident at plaintiff's store, the authorities learned that the 1986 Camaro Nash was driving had license plates registered to another auto. On that day, an unmarked City police car followed Nash in the Camaro, intending to stop him on suspicion of vehicle theft, but Nash apparently eluded the pursuing officer.

No further action was taken until the following Monday. As Deputy Sheriff Chapman stated in his deposition, this was "probably" because the officers assigned to the case had the weekend off. On Monday morning, June 22, 1987, Chapman took up surveillance of the house where Nash was believed to be staying. The Camaro was parked in the driveway. Nash and his girlfriend, Violet Nelson, emerged from the house and entered the Camaro. Nash backed out of the driveway and sped away. Chapman followed in his unmarked car and called his dispatcher for backup. He intended to stop Nash for vehicle theft once joined by his partner, Deputy Powell, who was assigned to another unmarked vehicle in the vicinity.

However, Chapman's radio call apparently received a wider broadcast than he intended. As a result, several marked and unmarked units, from both City and County, proceeded toward Chapman's location. Meanwhile, before Chapman himself could overtake the Camaro, Nash pulled into the parking lot of plaintiff's store, Rogers Food & Liquor. Nash and Nelson went inside to make purchases. Chapman parked on the street nearby, radioed his location, and asked again for backup. He intended to arrest Nash, with Powell's assistance, after Nash had left the store.

The several units now involved in the chase converged at the scene. The unmarked cars, and at least one of the marked vehicles, parked on the street and waited. However, two marked police cars, one from City and one from County, sped forward and into the store parking lot. At least one of these vehicles had its police lights flashing. The store clerk noticed the activity and thought he saw police officers pointing their weapons into the Camaro. He advised Nelson to duck behind the counter with him in order to avoid possible gunfire.

Thus alerted to the police presence, Nash attempted to leave by the rear door, but retreated when he saw that the building was surrounded. Nash then allowed Nelson and the clerk to leave the store, but refused to surrender himself. Thus the standoff began.

## II.

The majority and I agree on one point: the issue before us is of first impression in this state and unsettled elsewhere. California courts have never been called upon to determine whether the constitutional requirement of just compensation applies to the government's purposeful physical destruction of private property in furtherance of law enforcement activities. The few applicable decisions from other jurisdictions contain no consistent reasoning or result.

The majority suggest, however, that because California courts *have never applied* the just compensation clause to crime-fighting damage, it *does not* so apply. Hence, they reason, nonconstitutional remedies, which the Legislature may grant or withhold at will, are the damaged owner's sole recourse. But neither the language of the constitutional provision, nor its jurisprudential history, supports these illogical conclusions.

The majority assert at length that article I, section 19, applies only in the traditional realm of eminent domain—that is, where the government physically takes or damages property in the construction, operation, or maintenance of a "public improvement"—or to regulations which are the "functional equivalent" of condemnation. Their analysis is unpersuasive.

At the outset, the straightforward language of article I, section 19, calls for "just compensation" *whenever* the government "take[s] or damage[s]" private property "for public use." By their plain meaning, the broad terms "take," "damage," and "public use" appear to apply regardless of the powers under which government purports to act, the goals it seeks to achieve, or the circumstances in which injury is inflicted.

The majority observe that the language of article I, section 19, read in full, particularly prohibits a taking or damaging before the "condemnor" has begun "eminent domain proceedings" and has paid or deposited in court at least the "probable amount" of just compensation. Thus, the majority assert, the words of the clause actually demonstrate that it is "most directly" concerned with the state's exercise of its traditional condemnation power.[1]

However, this cited language merely proves a truism. The clause does obviously apply to "traditional" exercises of eminent domain, and in such cases the government must pay, or formally condemn and deposit, before a physical taking or damaging occurs. But nothing in the section states or implies the converse, i.e., that just compensation is due *only* where traditional eminent domain proceedings are possible or appropriate.[2]

The majority admit that by adding the critical words "or damaged" to article I, section 19 (cf. Cal. Const. of 1849, art. I, § 8; U.S. Const., Amend. V), the drafters of the 1879 Constitution intended to broaden the scope of constitutional relief even *beyond* strict physical invasion or injury. (See, e.g., *Reardon* v. *San Francisco* (1885) 66 Cal. 492, 501 [6 P. 317].) The majority nonetheless suggest that the sole purpose of the added language was to require compensation for certain kinds of consequential damage arising from a public improvement project. They quote from the debates of the 1878 Constitutional Convention to show that the drafters were particularly concerned about the effects of railroad and street improvements upon physical access to adjacent land in private ownership.

Again, however, the language of the 1879 Constitution discloses no such limitation. That the convention's delegates used contemporaneous examples to illustrate why the additional protective language was needed does not demonstrate that the protection applies only to injuries of that kind. (See *Locklin* v. *City of Lafayette* (1994) 7 Cal.4th 327, 364, fn. 20 [27 Cal.Rptr.2d 613, 867 P.2d 724].)

Finally, the majority assert that the California cases "uniformly [refute]" the expansive interpretation of article I, section 19, for which plaintiff

[1]Article I, section 19, provides in full as follows: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."

[2]I assume the majority are not suggesting that by the addition of this procedural language, the drafters of article I, section 19, intended a narrower protection than that provided by the analogous provision of the United States Constitution, which declares simply that "private property shall [not] be taken for public use without just compensation." (U.S. Const., Amend. V.)

argues. In support of this proposition, the majority cite some of the many decisions which discuss how the just compensation clause applies to damage caused by the construction, operation, or maintenance of public improvements. Not surprisingly, the analyses and holdings of these cases are expressed in that context. (See, e.g., *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441]; *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129]; *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276 [289 P.2d 1]; *Bacich* v. *Board of Control* (1943) 23 Cal.2d 343 [144 P.2d 818]; *Brown* v. *Board of Supervisors* (1899) 124 Cal. 274 [57 P. 82]; *Tyler* v. *Tehama County* (1895) 109 Cal. 618 [42 P. 240]; *Reardon* v. *San Francisco, supra,* 66 Cal. 492.)

However, these decisions neither state nor imply that the just compensation clause applies only to public improvements, or to eminent domain as traditionally understood. Nor do the authoritative modern cases, California or federal, support the outmoded view that government is exempt from payment for any and all physical damage inflicted by a valid exercise of the police power.

Indeed, persuasive current authority makes clear that the reach of the just compensation clause is determined by its fundamental purposes and policies, not by arbitrary categories and labels. When those purposes and policies are examined, they disclose no sound basis for excluding all deliberate physical property damage inflicted by public crime-fighting activities from the constitutional requirement of just compensation.

It is now well settled that the government's constitutional liabilities are not limited by the common law rights and duties of private parties, and they do not depend upon whether the government acted negligently, unreasonably, or ultra vires. (E.g., *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 303; *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, 257; *Reardon* v. *San Francisco, supra,* 66 Cal. 492, 505.) Nor are they affected by statutory immunities, such as those for discretionary government acts (e.g., Gov. Code, § 820.2) and for law enforcement actions taken with due care (*id.,* § 820.4). (See *Baldwin* v. *State of California* (1972) 6 Cal.3d 424, 438 [99 Cal.Rptr. 145, 491 P.2d 1121]; *Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 575, fn. 3 [136 Cal.Rptr. 751].)

Instead, the just compensation clause ensures that when government exercises its *valid and necessary* power to take or damage private property for public benefit, the adversely affected owner will not absorb alone a cost which the benefitted community should share. As the United States Supreme Court recently reaffirmed, the provision "is designed not to limit . . .

governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking. . . ." (*First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 315 [96 L.Ed.2d 250, 264, 107 S.Ct. 2378], italics in original.) Its function is " 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " (*Id.* at pp. 318-319 [96 L.Ed.2d at p. 266], quoting *Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [4 L.Ed.2d 1554, 1561-1562, 80 S.Ct. 1563]; accord, *Dolan* v. *City of Tigard* (1994) 512 U.S. ___, ___ [129 L.Ed.2d 304, 315-316, 114 S.Ct. 2309].)

Our own cases agree. We have stressed that the limits of inverse condemnation liability in California do not derive from common law principles, but from "the construction, 'as a matter of interpretation and policy' ([*Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, 262]), of our constitutional provision. The relevant 'policy' basis of article I, section [19], was succinctly defined in *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 642 [220 P.2d 897]: *'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.'* In other words, the underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by [the public enterprise as deliberately conceived]' (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 350 . . .): 'to socialize the burden . . . —to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society' (Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility,* 1966 Wis.L.Rev. 3, 8)." (*Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 303, italics added; see also *Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 296 [142 Cal.Rptr. 429, 572 P.2d 43].)

Of course, competing considerations limit the literal reach of the constitutional provision. It is well settled that not every governmental interference with private property is either compensable or void. "Government could hardly go on" if the Constitution prohibited it from taking any uncompensated action at the expense of private property. (*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 413 [67 L.Ed. 322, 325, 43 S.Ct. 158, 28 A.L.R. 1321].) We ourselves have acknowledged the concern that the costs imposed by " 'compensation allowed too liberally will seriously impede, if not stop,' " beneficial public undertakings. (*Varjabedian* v. *City of Madera, supra,* 20 Cal.3d 285, 296, quoting *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, 263, and *Bacich* v. *Board of Control, supra,* 23 Cal.2d 343, 350.)

Each claim must be examined with these competing concerns in mind. The task is to determine whether, under the particular circumstances, the constitutional purpose would be violated by allowing the community at large to escape the cost of damage its government, acting for the public benefit, has inflicted upon an individual property owner. (*Varjabedian* v. *City of Madera, supra,* 20 Cal.3d 285, 296-297.)

The requirement of compensation is not eliminated simply because the government purports to act under the police power. On the contrary, as the United States Supreme Court has pointed out, the power of government to take with compensation for a "public use" is "*coterminous* with the scope of a sovereign's police powers." (*Hawaii Housing Authority* v. *Midkiff* (1984) 467 U.S. 229, 240 [81 L.Ed.2d 186, 197, 104 S.Ct. 2321], italics added.) Regulatory exercises of that power have long been examined under the just compensation clause, and may accordingly be invalid if they go too far in damaging the value, use, or physical integrity of individual property without offering its owner payment for the loss. The high court recently reemphasized that "[i]f . . . the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].'" (*Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. 1003, __ [120 L.Ed.2d 798, 812, 112 S.Ct. 2886], quoting *Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. 393, 415 [67 L.Ed. 322, 325-326].)

Given the infinite ways in which the operations of modern government can affect private property, recent high court decisions have not depended upon whether a particular regulatory measure was the "functional equivalent" of eminent domain. They have "generally eschewed any ' "set formula" ' for determining" when a regulatory measure goes too far without compensation, preferring instead " 'essentially ad hoc, factual inquiries.' " (*Lucas* v. *So. Carolina Coastal Council, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 812], quoting *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646].) They make clear, however, that regardless of the context, subject, purpose, or design of the regulation, it is void if, without providing compensation, it compels *any physical invasion* of private property, denies the owner all economically viable use, or imposes substantial restrictions which have no "essential nexus" to a legitimate state interest. (*Dolan* v. *City of Tigard, supra,* 512 U.S. __, __ [129 L.Ed.2d 304, 317-323]; *Lucas* v. *So. Carolina Coastal Council, supra,* 505 U.S. at p. __ [120 L.Ed.2d at pp. 812-813]; see also *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 426, 435-440 [73

L.Ed.2d 868, 876, 882-885, 102 S.Ct. 3164].)[3] Again, California law is in substantial accord. (See, e.g., *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 272-277 [157 Cal.Rptr. 372, 598 P.2d 25] [zoning ordinance which deprives landowner of "substantially all reasonable use of his property"].)[4]

The majority imply, however, that in California, "legitimate" exercises of the police power which cause *direct* physical invasion, damage, or destruction are never compensable. While an older case from this court and some lower court decisions have advanced that premise, either expressly or implicitly (see, e.g., *Gray* v. *Reclamation Dist. No. 1500* (1917) 174 Cal. 622, 639-642 [163 P. 1024]; *Brown* v. *State of California* (1993) 21 Cal.App.4th 1500, 1504-1505 [26 Cal.Rptr.2d 687]; *Farmers Ins. Exchange* v. *State of California* (1985) 175 Cal.App.3d 494, 501 [221 Cal.Rptr. 225]; see *Freeman* v. *Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408 [95 Cal.Rptr. 852]), precisely the opposite is true. In modern times, this court, like the United States Supreme Court, has made clear that the government's physical invasion of property strikes at the heart of the just compensation clause, and that the police power to commit an uncompensated physical invasion is particularly narrow.

Thus, in *House* v. *L.A. County Flood Control Dist.*, *supra*, 25 Cal.2d 384, we explained that " '[t]he state or its subdivisions may take or damage private property without compensation if such action is *essential* to safeguard public health, safety, or morals. [[C]iting authorities.] *In certain circumstances, however, the taking or damaging of private property for such a*

---

[3]As the majority point out (maj. opn., *ante*, p. 377, fn. 5), the high court has indeed noted in several instances how the regulatory restrictions it was considering offered analogies to physical appropriation. But these observations undermine, rather than support, the majority's position. What they prove is the court's understanding that *however such an appropriation occurs*, it generally must be compensated. Indeed, the majority's "functional equivalency" argument proves too much, and thus collapses of its own weight. When a deliberate government action, taken for a public purpose, necessarily produces physical destruction or damage to individual private property, that *is* the "functional equivalent" of eminent domain —i.e., the government's "tak[ing]" or "damag[ing] of private property for a public use." We ourselves observed long ago that "when [the police power] passes beyond proper bounds in its invasion of property rights, it in effect *comes within the purview of the law of eminent domain* and its exercise requires compensation. [Citations.]" (*House* v. *L.A. County Flood Control Dist.*, (1944) 25 Cal.2d 384, 388 [153 P.2d 950], italics added.)

[4]Indeed, the constitutional provision applies, and a claim for inverse condemnation will lie, even against a governmental entity that has *no* direct "eminent domain" power at all. " ' "All that is necessary to show is that the damage resulted from an exercise of governmental power while seeking to promote 'the general interest in its relation to *any legitimate object of government.*' " ' " (*Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 867 [218 Cal.Rptr. 293, 705 P.2d 866], quoting *Sutfin* v. *State of California* (1968) 261 Cal.App.2d 50, 55 [67 Cal.Rptr. 665], italics added; see also *City of Oakland* v. *Oakland Raiders* (1982) 32 Cal.3d 60, 69 [183 Cal.Rptr. 673, 646 P.2d 835]; *Bauer* v. *County of Ventura*, *supra*, 45 Cal.2d 276, 284.)

*purpose is not prompted by so great a necessity as to be justified without proper compensation to the owner.* [[C]iting authorities.]' Thus . . . the exercise of the police power, though an essential attribute of sovereignty for the public welfare . . . cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property." (*Id.* at pp. 388-389, quoting *Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19, 23-24, italics added by *House.*)

In a later decision, we admonished that any direct physical damage which might be rendered noncompensable by the police power was limited to certain kinds of true emergency. "As we explained fully in *Rose* v. *State of California* (1942) 19 Cal.2d 713, 730-731 [123 P.2d 505], the 'police power' doctrine '[g]enerally . . . operates in the field of regulation,' rendering 'damages' occasioned by the adoption of administrative or legislative provisions noncompensable [citations]; this doctrine of noncompensable loss comes into play in connection with *more direct* 'taking' or 'damaging' of property *only* under 'emergency' conditions; i.e., when damage to private property is inflicted by government 'under the pressure of public necessity and to avert impending peril.' ([*House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 391].) Recognizing that a broad interpretation of this doctrine of noncompensable loss would completely vitiate the constitutional requirement of just compensation [citation], the courts have narrowly circumscribed the types of emergency that will exempt the public entity from liability. [Fn. omitted.]" (*Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 305, italics added; see also *Varjabedian* v. *City of Madera, supra,* 20 Cal.3d 285, 297 [noting "those core cases of direct physical invasion which indisputably require compensation"].)

In a footnote, *Holtz* v. *Superior Court, supra,* quoted a well-known passage containing examples of government acts that might satisfy an "emergency" exception: " 'Instances of this character are the demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, or rotten fruit, or infected trees where life or health is jeopardized.' " (3 Cal.3d at p. 305, fn. 10, quoting *House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 391.) Both the limited nature of these illustrative exceptions, and their irrelevance to the subject of public works and improvements, demonstrate the breadth of the general rule of compensation.

Several modern Court of Appeal decisions are to similar effect. For example, in *Rose* v. *City of Coalinga* (1987) 190 Cal.App.3d 1627 [236 Cal.Rptr. 124], the court upheld an inverse condemnation action seeking compensation for the summary demolition of a building which city officials

deemed unsafe after an earthquake. The court reasoned that an action for inverse condemnation will lie when "a governmental body, in the exercise of its police power to protect the public health, safety and welfare, intentionally destroys an owner's property in the absence of an emergency and compelling necessity and without according to the owner due process. . . ." (*Id.* at p. 1634.) Conversely, emergency, not mere exercise of the police power, provided the grounds for denial of compensation for physical damage to crops and other property caused by state efforts to eradicate an invasion of the Mediterranean fruit fly (Medfly). (*Teresi* v. *State of California* (1986) 180 Cal.App.3d 239, 243-244 [225 Cal.Rptr. 517]; *Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d 494, 501-503.)[5]

The majority invoke the principle that injury to property caused by the mere negligence of public employees is not a taking or damaging for "public use," and is thus not subject to the constitutional requirement of just compensation. (E.g., *Yee* v. *City of Sausalito* (1983) 141 Cal.App.3d 917, 920 [190 Cal.Rptr. 595]; *Eli* v. *State of California* (1975) 46 Cal.App.3d 233, 235 [120 Cal.Rptr. 63]; *Neff* v. *Imperial Irrigation Dist.* (1956) 142 Cal.App.2d 755, 757-758 [299 P.2d 359]; see *Miller* v. *City of Palo Alto* (1929) 208 Cal. 74, 76-77 [280 P. 108].) They stress our declarations, in cases dealing with public works or improvements, that the damage must stem from the improvement itself, as deliberately planned and constructed, not from negligence in the routine operation of the improvement. (See, e.g., *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 304; *Bauer* v. *County of Ventura, supra,* 45 Cal.2d 276, 286; *House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 396 (conc. opn. of Traynor, J.).)

In particular, the majority note a recent United States District Court decision, *Patel* v. *U.S.* (N.D.Cal. 1993) 823 F.Supp. 696, which addressed facts somewhat analogous to those now before us. *Patel* concluded as a

---

[5]In *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, we recognized one other narrow exception to the rule that physical invasions of property are compensable. This exception, arising from the "complex and unique province of water law" (*id.* at p. 306), traditionally held that damage caused by the normal operation of a flood control project as designed and constructed was not compensable. The root of the exception was that the government, like a private riparian owner at common law, had the right to confine surface waters within their natural channels without liability for resulting flood damage to adjacent lands. (*Id.* at p. 305; see *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, 262.) But modern recognition that inverse condemnation liability is not limited by common law principles has led to further limitation of this "flood control" exception. It survives only in the vestigial principle that if the government acted "reasonably" in the design, construction, or operation of a flood control project, or of other public improvements which increase the flow of surface water into a natural watercourse, it may be immune from liability for resulting flood damage. (*Locklin* v. *City of Lafayette, supra,* 7 Cal.4th 327, 367; *Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 565-566 [253 Cal.Rptr. 693, 764 P.2d 1070].)

matter of law that when police severely damaged a residence in order to serve a search and arrest warrant on the occupants, they committed, at most, mere routine negligence in day-to-day operations, for which compensation was not due under article I, section 19. (823 F.Supp. at pp. 697-699.)

But *Patel's* premise, like the majority's here, is simply wrong. Neither *Patel* nor this case is about routine government carelessness. On the contrary, in both instances, the government *chose* its damaging course of action, with full understanding of the probable injurious consequences, because it concluded that such action was necessary to achieve a public purpose—the surrender of persons wanted by the police. To paraphrase Justice Traynor, the damage to private property was "inherent," indeed expected, in the public undertaking *as deliberately designed and executed.* (See *House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 396 (conc. opn. of Traynor, J.).)[6]

Finally, there is no other basis for a conclusion that the facts of this case fail to establish a taking or damaging *for* "*public use.*" We have said that a use is "public" insofar as it "concerns the whole community or promotes the general interest in its relation to *any legitimate object of government.* [Citation.]" *Bauer* v. *County of Ventura, supra,* 45 Cal.2d 276, 284, italics added; see also *City of Oakland* v. *Oakland Raiders, supra,* 32 Cal.3d 60, 69.) " 'It is not essential that the entire community, or even any considerable portion thereof,' " enjoy a direct benefit from the taking. (*City of Oakland* v. *Oakland Raiders, supra,* at p. 69, quoting *Fallbrook Irrigation District* v. *Bradley* (1896) 164 U.S. 112, 161-162 [41 L.Ed. 369, 389-390, 17 S.Ct. 56].) Indeed, " '[i]t is irrelevant whether or not the injury to the property is accompanied by a corresponding benefit to the public purpose . . . , since the measure of liability is not the benefit derived from the property but the loss to the owner.' " (*Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, 263, quoting *House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 397 (conc. opn. of Traynor, J.).)

When a deliberate law enforcement action physically invades, destroys, or damages unoffending property, a "public use" has arisen by every logical measure. The authorities may be wholly entitled to act, and the owner has no

---

[6]I pass no judgment on whether the *result* of *Patel* v. *U.S., supra,* 823 F.Supp. 696, was right or wrong based on the particular circumstances of that case. From the sparse facts alleged in plaintiff Patel's complaint, it appears that police fired smoke, percussion, flash, and tear gas grenades into a residence in order to force the surrender of its permanent *tenants.* There may be a sound basis for denying compensation when the property destroyed or damaged was being used by its owners or permanent occupants for criminal purposes, and thus had *itself* become a nuisance which the government was privileged to abate. (See discussion, *post.*) No such considerations are presented here.

right to prevent them from doing so. The damage is inflicted on behalf of the "whole community," by its representatives, for a public purpose. The public thereby "use[s]" and "enjoys" the damaged property just as in every case where deliberate government conduct undertaken for public benefit physically invades, destroys, or damages private property. Failure to compensate the owner under these circumstances may thus single it out for a burden which, under the Constitution, should be distributed throughout the benefitted society at large.[7]

---

[7]The concurring opinion argues that I am mistaken in finding the requirement of a "public use" to be satisfied in this case. Though it acknowledges "incoherence" and inconsistency in the authorities, the concurrence discerns the principle that a compensable public "use" does not occur unless the government somehow conscripts the targeted property and presses it into "affirmative, productive" service. (Conc. opn. of Kennard, J., *ante*, at pp. 398-399.) Thus, the concurrence reasons, no right to "just compensation" arises when the government merely destroys or damages property for reasons unrelated to the property's public usefulness.

Isolated snippets of case law support this limited view of "public use," but the concurrence's analysis does not withstand close scrutiny. On the contrary, it is a fundamental tenet of inverse condemnation law that with limited exceptions, compensation is due for incidental physical injury as well as for direct appropriation and use. Indeed, as noted above, the phrase "or damaged" was added to article I, section 19, in order to remove all possible doubt on the point. (See, e.g., *Reardon* v. *San Francisco, supra,* 66 Cal. 492, 501-506.) Only by novel and tortured reasoning, not employed by the cases themselves, can the concurrence suggest that government put to "affirmative, productive use" the land flooded because of upstream public improvements in *Locklin* v. *City of Lafayette, supra,* 7 Cal.4th 327, or the property undermined by adjacent excavation for a public transit system in *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, or the homes that suffered landslide damage as the result of a nearby road construction project in *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d 250, or the parcels inundated by the overflow of artificial drainage ditches in *Bauer* v. *County of Ventura, supra,* 45 Cal.2d 276, or the building demolished as an earthquake hazard in *Rose* v. *City of Coalinga, supra,* 190 Cal.App.3d 1627.

These and numerous other California cases have stated or assumed from time immemorial that when physical injury is the incidental consequence of deliberate government action in furtherance of public *purposes,* the damaged or destroyed property *has* been appropriated for "public use," and the public *has* effectively exercised its entitlement to "use and enjoyment" of the property with compensation. (E.g., *Bauer* v. *County of Ventura, supra,* 45 Cal.2d at p. 284; see also, e.g., *Albers* v. *County of Los Angeles, supra,* 62 Cal.2d at p. 258; *Clement* v. *State Reclamation Board, supra,* 35 Cal.2d 628, 641 [construction of public improvement was "a deliberate action of the state *in furtherance of public purposes,*" requiring compensation for consequential damage (italics added)], citing, inter alia, *Hooker* v. *Farmers' Irr. Dist.* (8th Cir. 1921) 272 Fed. 600, 603 [when damage to adjacent property was necessarily inflicted by permanent operation and maintenance of a canal for the "public use," failure to compensate violated Nebraska's constitutional proscription against taking or damaging "for public use"]; *Tormey* v. *Anderson-Cottonwood Irr. Dist.* (1921) 53 Cal.App. 559, 568 [200 P. 814] [damage inflicted by intended operation of adjacent canal constructed and operated "for public use" must be compensated].) Similar statements or assumptions suffuse federal law. (See, e.g., *Yee* v. *Escondido* (1992) 503 U.S. 519, 527 [118 L.Ed.2d 153, 165, 112 S.Ct. 1522]; *Pumpelly* v. *Green Bay Company* (1872) 80 U.S. (13 Wall.) 166, 177-181 [20 L.Ed. 557, 560-561]; *Langenegger* v. *United States* (Fed.Cir. 1985) 756 F.2d 1565, 1570.)

The facts of the case before us conform to this long-settled understanding of "public use." Despite the concurring opinion's attempt to characterize the facts differently, the police did

As the majority concede, two of the three most recent analogous authorities from other states support these views. (*Wegner* v. *Milwaukee Mut. Ins. Co.* (Minn. 1991) 479 N.W.2d 38 [23 A.L.R.5th 954]; *Steele* v. *City of Houston* (Tex. 1980) 603 S.W.2d 786.) In both cases, the homes of innocent persons were seriously damaged when the police used tear gas or explosive devices to flush out fugitives who had fortuituously taken shelter there. Though these decisions did not contain extensive reasoning, they deemed it manifest, under state constitutional language similar to California's, that an individual owner may suffer an unfair and disproportionate burden if not compensated when the government inflicts physical damage upon his unoffending private property as the chosen means of accomplishing a public objective under the police power.[8]

The majority find it "anomalous" that the government's deliberate infliction of damage upon private property in service of a public goal might give rise to legal protections which would not apply to personal injury caused by the same action. But there is no doubt that for profound historical reasons, the California Constitution, like its federal counterpart, is peculiarly concerned with the power and temptation of unchecked government to decree the uncompensated sacrifice of private property for the common benefit. The availability of professional fees and prejudgment interest in inverse condemnation actions merely confirms that when the sovereign, having imposed such a sacrifice, declines to satisfy its constitutional obligation of compensation, the expense of exacting the payment due should not fall upon the hapless owner. I see nothing anomalous in the application of those principles to the facts of this case.

---

put plaintiff's property to "public use" by sacrificing it as the deliberate means of achieving their law enforcement purpose.

[8] As authority against these two decisions, the majority cite *Indiana State Police* v. *May* (Ind.Ct.App. 1984) 469 N.E.2d 1183, which involved somewhat similar facts. The primary issue in *May* was whether a deliberate police decision to end a hostage situation by firing tear gas into a residence was protected against a *tort* action by the "law enforcement" immunity of Indiana's Tort Claims Act. As an afterthought, *May* dismissed in two terse sentences the plaintiff's alternate "takings" claim. The court simply declared, without analysis or citation, that the conduct alleged was "in the nature of tort." (*Id.* at p. 1184.) *May*'s failure to distinguish between tort and eminent domain principles echoes the flaw in *Patel* v. *U.S.*, *supra*, 823 F.Supp. 696, and in the majority's reasoning here. In any event, given the particular facts of *May*, its *result* is not clearly incorrect under an inverse condemnation theory. As I indicate below, when public safety officers, responding to a situation they did not create, act to rescue or aid the owner or possessor of property, thus conferring a significant *private* benefit by their action, the Constitution may not require separate compensation for any incidental damage caused to the property in the course of rendering assistance. In *May*, one purpose of the police action was to rescue the occupants of the damaged residence after they were taken hostage by fleeing suspects who chose the home as a refuge. Here, though it might be said that the police action aided plaintiff in removing a dangerous trespasser from its premises, there was no need to do so until the police, acting in furtherance of a *preexisting public purpose*, trapped the suspect inside the store. (See discussion, *post.*)

I therefore conclude that article I, section 19, entitles plaintiff to reimbursement for physical damage inflicted by the deliberate police action, unless the particular facts of this case present a sound exception to the rule of compensation. I turn to that question.

## III.

As the majority suggest, both state and federal law have recognized a limited number of specific situations where government, in the exercise of its police power, may take deliberate action for the public benefit without paying compensation for resulting physical damage or destruction to private property. Among the exceptions most commonly articulated are "nuisance," and "emergency" or "necessity." The courts have explained these exceptions, sometimes incompletely, on various theoretical and policy grounds. But in California it is now clear that unless the exceptions are narrowly circumscribed and strictly justified, the constitutional requirement of just compensation will be improperly "vitiate[d]." (*Holtz* v. *Superior Court*, *supra*, 3 Cal.3d 296, 305.)

One well-settled limitation is the maxim that government may abate a nuisance without compensation. There is, of course, no constitutional right to maintain property in a dangerous or unwholesome condition. The United States Supreme Court long ago observed that "[t]he exercise of the police power by the destruction of property which is itself a public nuisance . . . is very different from taking property for a public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner." (*Mugler* v. *Kansas* (1887) 123 U.S. 623, 669 [31 L.Ed. 205, 213, 8 S.Ct. 273].)

One prominent commentary has suggested that the so-called "emergency" exception is justified *solely* on nuisance grounds. After reviewing the cases, this commentary deemed it "likely" that the Constitution requires compensation for deliberate physical destruction of property by the government unless the property was by then already so dangerous or endangered as the result of external events or conditions that its compensable value was lost in any event. (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 24, p. 147.)

Our own cases support that view by the examples they cite of noncompensable emergencies. " '[T]he demolition of all or parts of buildings to prevent the spread of conflagration, or the destruction of diseased animals, or rotten fruit, or infected trees where life or health is jeopardized' " (*Holtz* v. *Superior Court, supra*, 3 Cal.3d 296, 305, fn. 10, quoting *House* v. *L.A.*

*County Flood Control Dist., supra,* 25 Cal.2d 384, 391) all appear to involve property which has already lost its compensable value because it will likely cause, exacerbate, or fall victim to an external threat to public health, safety, or welfare.

Many, if not all, of the relatively few United States Supreme Court and California cases that actually purport to apply an "emergency" exception can comfortably be viewed in this nuisance context. (See, e.g., *United States* v. *Caltex, Inc.* (1952) 344 U.S. 149 [97 L.Ed. 157, 73 S.Ct. 200] [wartime destruction of refinery about to fall to Japanese];[9] *Miller* v. *Schoene* (1928) 276 U.S. 272 [72 L.Ed. 568, 48 S.Ct. 246] [destruction of ornamental trees harboring pest ruinous to nearby commercial apple orchards]; *United States* v. *Pacific R.R. Co.* (1887) 120 U.S. 227 [30 L.Ed. 634, 7 S.Ct. 490] [military demolition of railroad bridges in path of advancing Confederate forces]; *Bowditch* v. *Boston* (1879) 101 U.S. (11 Otto) 16 [25 L.Ed. 980] [building in path of urban conflagration]; *Surrocco* v. *Geary* (1853) 3 Cal. 69, 73 [house in path of spreading urban fire "becomes a nuisance, which it is lawful to abate"]; *Rose* v. *City of Coalinga, supra,* 190 Cal.App.3d 1627 [destruction of building rendered unsafe by earthquake]; *Teresi* v. *State of California, supra,* 180 Cal.App.3d 239 [destructive quarantine and fumigation of pepper crop which threatened to harbor and spread Medfly infestation]; cf. *Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d 494 [incidental damage from battle against Medfly invasion].)[10]

However, the cases do not uniformly assert nuisance as the sole basis for an "emergency" exception, and they contain suggestions of a somewhat

---

[9]The court in *United States* v. *Caltex, Inc., supra,* specifically noted that "[h]ad the Army hesitated, had the facilities only been destroyed [by the enemy] after [the Army's] retreat, respondents would certainly have no claims to compensation." (344 U.S. at p. 155 [97 L.Ed. at pp. 155-156].)

[10]Even where nuisance is the basis for emergency destruction, the government must still justify its action after the fact, and must provide compensation for the destruction of property which was not, in fact, dangerous and worthless. A noted commentary has characterized the prevailing rule as follows: "In all such cases the owner is entitled to a hearing at some stage of the proceedings on the question whether his property was, in fact, a nuisance, and if it was not, he is entitled to compensation for its destruction. [Fn. omitted.] It may well be a reasonable method and necessary for the public health to destroy first and investigate afterward; but if sound and valuable property is destroyed as a result of such necessity, it is taken for the public use in the constitutional sense and the owner is entitled to compensation. [Fn. omitted.]" (1 Nichols, Eminent Domain (3d ed. 1992) § 1.42[15], pp. 552-553.) California law is in accord. (*Rose* v. *City of Coalinga, supra,* 190 Cal.App.3d 1627, 1635; *Leppo* v. *City of Petaluma* (1971) 20 Cal.App.3d 711, 719 [97 Cal.Rptr. 840]; see *Armistead* v. *City of Los Angeles* (1957) 152 Cal.App.2d 319, 323-324 [313 P.2d 127]; but cf. *Farmers Ins. Exchange* v. *State of California, supra,* 175 Cal.App.3d 494 [no compensation due for auto paint incidentally damaged by nearby Medfly spraying].)

broader reason for the existence of such a limitation. For example, in *United States* v. *Caltex, Inc., supra,* 344 U.S. 149, the court cited "the common law['s] . . . long recogni[tion] that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved. [Fn. omitted.]" (344 U.S. at p. 154 [97 L.Ed. at p. 162].)

We ourselves have asserted that "under the pressure of public necessity and to avert impending peril, the legitimate exercise of the police power often works not only avoidable damage but destruction of property without calling for compensation. . . . In such cases calling for immediate action the emergency constitutes full justification for the measures taken to control the menacing condition, and private interests must be held wholly subservient to the right of the state to proceed in such manner as it deems appropriate for the protection of the public health or safety. [Citation.]" (*House* v. *L.A. County Flood Control Dist., supra,* 25 Cal.2d 384, 391.)

The cases imply, and the majority vigorously assert, that the exception is fueled by concerns about government's ability to respond promptly and fully to a public health or safety threat without fear of unlimited liability for resulting property damage. This is no doubt a significant consideration; "[g]overnment could hardly go on" (*Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. 393, 413 [67 L.Ed. 322, 325]) if the sovereign were strictly accountable for any and all damage caused by its emergency responses. But given the broad cost-spreading purposes of the just compensation clause, some means must be found to confine any "emergency" exception within narrow and appropriate bounds.

What principles can reconcile the competing considerations? As we have indicated, the law of nuisance may provide one such principle. Another has been suggested by the United States Supreme Court in cases of wartime destruction by military necessity to thwart an advancing enemy. In *United States* v. *Caltex, Inc., supra,* 344 U.S. 149, the court observed: "The terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war. This Court has long recognized that in wartime many losses *must be attributed solely to the fortunes of war, and not to the sovereign.* [Fn. omitted.]" (344 U.S. at pp. 155-156 [97 L.Ed. at p. 163], italics added.) Earlier, in *United States* v. *Pacific R.R. Co., supra,* 120 U.S. 227, the court

had asserted that such wartime losses are "merely accidents," "misfortunes which chance deals out to the proprietors on whom they happen to fall." (120 U.S. at p. 234 [30 L.Ed. at p. 637].)

By parity of reasoning, it may be appropriate to conclude, in other contexts as well, that all owners incur the risk of property damage from certain external human or natural events beyond their control. Under this analysis, when such external events force the government, on behalf of the whole community, to respond in ways that are the direct cause of damage, that damage is properly "attributed" to the external event itself, and not to the government's necessary response.[11]

As indicated above (*ante*, at p. 415, fn. 7), compensation may perhaps also be properly denied when the owner or occupant of the damaged property already received a significant, peculiar *private* service or benefit from the government's action. For example, if damage was caused by police or paramedical officers while attempting to rescue an endangered householder, or by firefighters in an effort to save the injured property itself from the greater ravages of spreading flames, it seems doubtful that the damage was for a *public* use, or that compensation to the benefitted owner is "just." In such cases, within the purposes of the Constitution, one might argue that the owner is not being forced to shoulder alone the cost of a public undertaking which should be shared by the community at large.

Finally, despite the majority's worries about "stray bullet" damage, there may be grounds for concluding that the government is not liable for every kind of minor, incidental injury to property arising from its deliberate response to an emergency. As we have seen, it is already well established that "routine negligence" in government operations is not a constitutionally compensable taking or damaging for "public use." A similar analysis may

---

[11]Even this justification for an "emergency" exception is not free from analytical doubt. Indeed, one commentator has suggested that "[d]estruction of private property to prevent it from falling into enemy hands in wartime or to deny its combustible elements to a raging fire —the typical instances of [so-called] 'denial destruction'—has all the earmarks of a taking of private property for public purposes, surely a legitimate and therefore compensable public 'use' within constitutional standards. . . . Thus, where just compensation is denied, one would expect to find overriding reasons for disregarding the literal application of the constitutional mandate. [¶] . . . [Yet] [n]one of [the] cases [denying compensation in such situations] undertook an adequate theoretical discussion, apart from expressions of judicial reluctance to impose unforeseeable and potentially enormous liabilities upon public entities." (Van Alstyne, *Statutory Modification of Inverse Condemnation: Deliberately Inflicted Injury or Destruction* (1968) 20 Stan.L.Rev. 617, 619-620.)

apply to insubstantial, peripheral damage which arises from emergency government action that was not focused on the property for which compensation is sought.

Whatever the merits of these rationales for denial of compensation, however, they all at least assume that the emergency or nuisance was truly external, *and not of the government's own making*. It is one thing to say that owners, not government, must bear the risk of losses arising from the injurious condition of their property, or from the government's intervention against public dangers presented by the general forces of humanity or nature. It is another to suggest that government may escape liability when its *own deliberate pursuit of its nonemergency public goals is directly responsible* for the emergency that required damage or destruction to private property.

In the latter case, at least, the damage *is* properly "attributed" to the government, it *has* occurred "for a public use," and if not compensated, it *will* impose an unfair and disproportionate cost of the public undertaking upon the affected owner. Accordingly, I submit, the Constitution must prevail over other considerations that might counsel immunity.

Indeed, in these circumstances, the policy reasons for such immunity largely evaporate. The government is not being held unfairly accountable for its response under the pressure of a crisis imposed by outside forces. It is simply being assessed for the true cost of the public enterprise in which, by its own choice, it was originally engaged.

## IV.

It seems manifest under the principles I have discussed that compensation is due in this case. The authorities deliberately inflicted substantial injury upon plaintiff's property as the chosen means of achieving certain public purposes under the police power. But the affected property itself harbored no preexisting public nuisance or injurious condition. Nor had a paramount danger, public or private, simply arisen from external events, forcing an unwitting government to respond. Instead, the "emergency" claimed by defendants, and the involvement of plaintiff's store in that emergency, were the sole and direct result of the time, place, and manner in which defendants themselves decided to achieve the capture of a public enemy.

The entry of the marked police cars into plaintiff's parking lot, which was the immediate cause of the standoff between suspect Nash and the police, can perhaps be dismissed for constitutional purposes as mere "routine

negligence." However, the police strategy for apprehending Nash also involved more considered actions and judgments, undertaken over the preceding hours and days in an atmosphere notably free of emergency pressure. These were the overriding reasons that Nash, originally a peaceful customer in plaintiff's store, came to find himself a fugitive trapped on the premises.

We need not determine whether the police actions and judgments that led to the standoff were right or wrong. Either way, I am persuaded that the government cannot escape its constitutional obligation to compensate plaintiff, an innocent bystander, for the extensive damage caused by the deliberate execution of the public enterprise.[12]

Nothing in the views I have expressed diminishes my support for vigorous and effective law enforcement or my profound respect for the public officers who execute that difficult, dangerous, and vital function. As I have indicated, the constitutional requirement of just compensation does not assume that the action which caused compensable damage was tortious or otherwise improper. On the contrary, the provision declares that even if the government acted properly in the public interest, the cost of its action should not fall disproportionately on an individual owner.

Sound constitutional and policy reasons may exist for excusing compensation in certain law enforcement situations. Indeed, the majority's strained effort to avoid applying the just compensation clause in this case is primarily motivated by their understandable solicitude for the perceived practicalities of government operations. But concerns about fiscal consequences or governmental convenience cannot always prevail over the Constitution's purpose. Here I simply conclude that where deliberate government action caused the situation in which damage became necessary, and extensive

---

[12]The majority claim I suggest unreasonably that the government was somehow "responsible" for Nash's refusal to surrender. They find illogic in my assertion that the damage inflicted in this case requires compensation, even if other crimefighting damage might not. And they point to evidence that trapping Nash inside the store, instead of confronting him on the street or elsewhere, "did not necessarily turn out to be a poor strategy." (Maj. opn., *ante*, at p. 385, fn. 9.) Of course, the issue is not whether the police are accountable for the predictable efforts of a trapped fugitive to resist capture. I merely assert that in this particular case, deliberate, voluntary choices by the government, made under nonemergency conditions, caused such resistance to take place on plaintiff's property and thus required the sacrifice of that property to achieve public ends. Under these circumstances, at least, there is no legitimate basis for application of an "emergency" exception. And the majority's implication that the police may have done nothing wrong by trapping Nash in the store is irrelevant for constitutional purposes. As I have explained, the just compensation clause does not target the government's fault, poor judgment, or abuse of authority. Instead, it assumes the government's actions and decisions were valid, but nonetheless protects against undue individual sacrifice for the public benefit.

physical damage was itself inflicted as a deliberate means of resolving the crisis, the well established intendments of the Constitution must be honored.

I would reverse the judgment of the Court of Appeal.

Mosk, J., and Arabian, J., concurred.

Appellant's petition for a rehearing was denied July 13, 1995. Mosk, J., and Baxter, J., were of the opinion that the petition should be granted.